## 669 ATLANTIC STREET ASSOCIATES *v.* ATLANTIC-ROCKLAND STAMFORD ASSOCIATES (14928)

Dupont, C. J., and Schaller and Hennessy, Js.

Argued May 2—officially released September 17, 1996

*James R. Fogarty*, with whom were *Stephanie Budlong Paul* and, on the brief, *Jennifer Paul Cohen*, for the appellant (defendant).

*Katherine C. Callahan*, with whom were *Kevin N. Reynolds* and, on the brief, *M. Catherine Healy*, for the appellee (plaintiff).

SCHALLER, J. The defendant appeals from the judgment of foreclosure and in favor of the plaintiff on the defendant's counterclaim rendered after a trial to the court. The defendant claims that the trial court improperly (1) determined that the plaintiff's failure to pay rent did not preclude the plaintiff from foreclosing the mortgage, (2) granted the plaintiff's motion to dismiss count three of its counterclaim alleging that the plaintiff violated the Connecticut Unfair Trade Practices Act (CUTPA),[1] (3) determined that its allegations of breaches of the contract and lease by the plaintiff did not constitute allegations of material breaches that would excuse the defendant from its performance and (4) granted the plaintiff's motion to strike the case from the jury list. We affirm the judgment in part, but reverse the judgment on two counts of the defendant's counterclaim and remand the matter for a trial to a jury on those counts.

---

[1] General Statutes §§ 42-110a through 42-110q.

The trial court found the following facts. The plaintiff is a Connecticut general partnership consisting of two partners, John Schorsch and Paul Gugenheim. Schorsch and Gugenheim also owned and operated the Royal Metals Corporation (Royal Metals), a company that reclaims precious metals primarily by burning waste photographic film. The defendant is also a Connecticut general partnership and originally consisted of Peter Malkin and Bruce Warwick. In November, 1990, Warwick sold his interest in the defendant to ARSA Associates, which consists of Peter Malkin and his son, Anthony Malkin.

During the early 1980s, the plaintiff assembled a group of four properties in the south end of Stamford. Royal Metals operated on one of the properties and the remaining space was leased to tenants, including Ovablac, Northeast Fiberglass and New England Fiberglass. In 1985, the plaintiff decided to sell the property. Warwick and Peter Malkin were then developing the Metro Center office complex through Warwick Malkin, Inc., and W & M Properties. The Metro Center was close to the plaintiff's properties. When the plaintiff approached Warwick and Peter Malkin, they indicated an interest in buying the properties in order to develop an office complex adjacent to the Metro Center.

In the late winter and early spring of 1986, the plaintiff began negotiating with Warwick and Peter Malkin for the sale of the properties. Warwick and Malkin, however, needed time to acquire additional properties necessary for the development of the Metro Center. The plaintiff wanted to continue operating Royal Metals for a few more years, but also wanted to realize immediate cash. The parties therefore planned a sale and lease back transaction. From April to September, 1986, they negotiated and drafted four documents: a contract for the sale of the properties to the defendant; a lease of the properties back to the plaintiff; a purchase money

note; and a mortgage to secure the unpaid portion of the purchase price.

The primary subject of the negotiations was the presence of hazardous wastes and material on the properties and the possibility of resulting contamination. Both Warwick and Peter Malkin had serious concerns about the environmental condition of the properties and insisted on a preliminary environmental investigation and testing of the properties pursuant to provisions included in the core documents.

On September 30, 1986, the contract of sale was executed. The contract provided for a purchase price of $5,637,500, of which $1,437,000 would be paid prior to closing with the balance to be paid on December 31, 1989, according to the terms of a nonrecourse promissory note secured by a nonrecourse mortgage on the property. In the contract, the plaintiff represented that to the best of its knowledge, as of the closing, there were no conditions on the property in violation of law or governmental regulation and that any hazardous waste on the property would be managed according to applicable laws and regulations. The parties also agreed that the sale would constitute a transfer of a "hazardous waste establishment" within the meaning of General Statutes §§ 22a-134 through 22a-134d and that pursuant thereto the plaintiff would furnish a "negative declaration" to the defendant. The plaintiff also promised to have another environmental site assessment performed on the properties during the last three months of the lease term and, if that assessment recommended any cleanup, to "promptly undertake" and "diligently prosecute" that work to completion.

The note, mortgage and lease were executed at the closing on November 17, 1986. The note was in the principal amount of $4,200,000 and was due on December 31, 1989. It provided for an annual interest rate

of 7.72 percent to be paid in quarterly installments of $81,060. The note further provided for a default interest rate of 15 percent. The lease required the plaintiff to pay rent, taxes, insurance and all other carrying costs of the properties. The plaintiff's rent was due quarterly and was equal to the amount of the defendant's interest payments. The lease expired on December 31, 1989, the date the note was due.

During the term of the lease, a dispute arose about the plaintiff's performance of its obligations concerning the environmental condition of the property and the presence and extent of environmental contamination. The plaintiff and the defendant each retained an environmental consultant, and each consultant performed a preliminary environmental site assessment of the property by October 31, 1989. The parties also began negotiating an extension of the maturity date of the note and mortgage while their attorneys coordinated a joint effort by their respective environmental consultants to assess the condition of the properties. The parties also discussed extending the lease with Royal Metals as the lessee. The parties, however, never reached an agreement regarding the extensions. In June, 1990, and April, 1991, the environmental consultants made their final recommendations.

The defendant's consultant, HRP Associates, Inc. (HRP), identified two primary areas of concern. First, HRP noted that the soil in the loading dock area near Royal Metals contained impermissible levels of trichloroethylene and tetrachloroethylene. Second, the soil in the New England Fiberglass drum storage area contained impermissible levels of acetone. HRP also recommended asbestos removal, cleaning of the interior of the Royal Metals building and the excavation of an underground tank and some surrounding soil. The plaintiff's consultant, TRC Environmental Consultants, Inc., believed that only the drum storage area warranted

remediation. HRP estimated that in the worst case scenario, the maximum cost of remediation would be $275,000. TRC estimated a cost of $91,000 to remove soil from the drum storage and loading dock areas and to remove the underground tank and surrounding soil.

Royal Metals also became involved in a dispute with the state department of environmental protection (department). In August, 1986, apparently without the defendant's knowledge, department inspectors visited the properties. Department inspectors also inspected the properties in March, 1990. As a result of the inspections, the department ordered Royal Metals to test its incoming and outgoing waste streams for hazardous materials. These tests would enable the department to determine how Royal Metals should be classified under the pertinent environmental laws. Because Royal Metals failed to perform these tests, the department issued an order of abatement in June, 1990. Royal Metals then made some effort to test its waste streams, but it never complied with the order to the department's satisfaction. The department, therefore, referred the matter to the attorney general who brought a civil action against Royal Metals in February, 1991. By May, 1991, Royal Metals had left Connecticut. In September, 1991, the action was withdrawn and the abatement order closed.

In March, 1992, Gugenheim returned to the property to oversee the removal of the suspected acetone contaminated soil from the drum storage area. The plaintiff gave no advance notice of the cleanup to either the defendant or the department. The department made a visual inspection of the properties in July, 1992, and concluded that "[n]o additional remedial action is necessary at the site," but did not conduct any further soil or groundwater testing.

On June 13, 1990, the plaintiff commenced this action to foreclose its mortgage on the properties located at

669 Atlantic Street in Stamford. On October 16, 1990, the defendant filed an answer, including seven special defenses, and a counterclaim consisting of four counts.

## I

The defendant claims first that the trial court improperly determined that the plaintiff could foreclose the mortgage despite the plaintiff's failure to pay rent after December 31, 1989. The defendant argues that, pursuant to paragraph 4. J. of the mortgage, the plaintiff's payment of rent is a condition precedent to the defendant's obligation to pay the balance of the note.[2] Paragraph 4. J. of the mortgage provides in pertinent part: "Notwithstanding any contrary provisions of the note or of the mortgage which it secures relating to events of default, no default herein or therein specified shall be deemed to exist . . . so long as the lessee *under that certain lease dated even date herewith covering the mortgaged premises* . . . shall be in default in the payment of rent, additional rent or in the performance of any other obligations . . . ." (Emphasis added.) Because the plaintiff did not pay rent after December 31, 1989, therefore, the defendant asserts that the plaintiff cannot foreclose on the mortgage. We find no merit in the defendant's claim.

The trial court found the following additional facts regarding the holdover tenancy of the plaintiff. In 1988, the defendant began negotiating a direct lease with Royal Metals. In January, 1989, they had agreed on some terms, but not on others, including rent. Later in 1989, the plaintiff and the defendant began negotiating extensions of the note and mortgage, but they did not reach

---

[2] In its first special defense, the defendant asserted: "Contrary to its statutory and common law obligations as a holdover tenant, it failed to pay to the defendant both the rent and additional rent . . . . As a consequence of said defaults by the plaintiff in its obligations under said lease, no default is deemed to exist on the part of the defendant under either the note or the mortgage."

an agreement by December, 1989. In January, 1990, the plaintiff and the defendant reached a tentative agreement on certain points regarding extensions of the note and mortgage, and the defendant and Royal Metals reached a tentative agreement for a direct lease. Negotiations continued into the summer of 1990, when there were significant disagreements, mainly concerning environmental issues. The parties neither completed their negotiations nor reached a final agreement.

On the basis of those facts, the court determined that "[f]ollowing expiration of the lease on December 31, 1989, [the plaintiff] became a tenant at sufferance and, as such, no longer had any contractual obligation to pay rent. . . . A tenant at sufferance has no contractual obligation to pay rént but, rather, is required by law to pay the reasonable value of his/her use and occupancy of the property. [*Welk* v. *Bidwell*, 136 Conn. 603, 607, 73 A.2d 295 (1950)]; *Lonergan* v. *Connecticut Food Store, Inc.*, 168 Conn. 122, 357 A.2d 910 (1975); *Housing Authority* v. *Hird*, 13 Conn. App. 150, 535 A.2d 377 (1988). . . . While [the defendant] may have had a claim for the reasonable value of [the plaintiff's] use and occupancy beyond December 31, 1989, after that date, [the defendant] could no longer claim protection of paragraph 4. J."

The defendant argues that the trial court's conclusion that the plaintiff was a tenant at sufferance is clearly erroneous. The defendant asserts, rather, that the plaintiff was a tenant at will and, therefore, responsible to pay rent to the defendant and the failure to pay such rent precluded the plaintiff from foreclosing the mortgage pursuant to paragraph 4. J. The defendant also argues that the trial court improperly determined that if the plaintiff was obligated to pay a fair rental value as a tenant at sufferance, the fair rental value did not fit within the definition of rent for the purposes of paragraph 4. J. of the mortgage.

It is unnecessary for this court to decide whether the trial court's conclusion that the plaintiff was a tenant at sufferance is clearly erroneous. It is clear that the lease expired on December 31, 1989, that the parties had not reached an agreement for an extension of the lease and that the plaintiff continued in possession of the properties as a holdover tenant. "Holding over by any lessee, after the expiration of the term of his lease, shall not be evidence of any agreement for a further lease." General Statutes § 47a-3d; *David A. Altschuler Trust* v. *Blanchette*, 33 Conn. App. 570, 573–74, 636 A.2d 1381, cert. denied, 229 Conn. 906, 640 A.2d 117 (1994).

Paragraph 4. J. of the mortgage was predicated on a failure to pay rent pursuant to the lease dated November 17, 1986. Whether the plaintiff had become a tenant at will[3] or a tenant at sufferance,[4] the legal obligations that followed were distinct from those under the original lease. The parties were unable to agree to an extension of the lease, and that unchallenged portion of the trial court's conclusion defeats the defendant's claim that the plaintiff could not foreclose on the mortgage due to its failure to pay rent.

## II

The defendant claims next that the trial court improperly dismissed the third count of its counterclaim alleging a violation of CUTPA. The defendant argues that it presented evidence of a prima facie CUTPA claim, but that the trial court rejected the evidence despite the court's obligation in deciding a motion to dismiss to

---

[3] A tenancy at will "exists only when the occupation of the property is with the landowner's consent, continuing during the tenancy." *Welk* v. *Bidwell*, supra, 136 Conn. 608.

[4] " 'A tenancy at sufferance arises when a person who came into possession of land rightfully continues in possession wrongfully after his right thereto has terminated. . . .' " (Citations omitted.) *Berlingo* v. *Sterling Ocean House, Inc.*, 5 Conn. App. 302, 308, 504 A.2d 516 (1986), rev'd on other grounds, 203 Conn. 103, 523 A.2d 888 (1987).

construe the evidence in its favor. See *Discover Leasing, Inc.* v. *Murphy*, 33 Conn. App. 303, 308, 635 A.2d 843 (1993). We find no merit in the defendant's claim.

The defendant alleged in its counterclaim that the plaintiff violated CUTPA by its continued use of the properties after the lease expired and by its failure to maintain the properties in an environmentally sound condition. The trial court determined that the plaintiff's continued use of the property did not constitute a violation of CUTPA because it was done with the defendant's knowledge. The court also determined that the plaintiff's failure to maintain the properties in an environmentally sound condition did not constitute a violation of CUTPA because "the property was not different from that for which [the defendant] bargained." The court held, therefore, that the defendant did not suffer an ascertainable loss.

The defendant now challenges the dismissal of the CUTPA count, arguing that the trial court improperly determined that it received that for which it bargained in the lease and the contract of sale. Pursuant to the lease, the defendant argues that the plaintiff did not tender custody or control of the subject premises at the expiration of its lease; second, the plaintiff did not satisfy its obligations to conduct a site assessment of the properties during the last three months of the lease and failed to undertake promptly any work necessary to ensure that the properties complied with state environmental statutes.

The defendant asserts that it did not receive that for which it bargained under the contract because the plaintiff did not deliver the negative declaration required by the contract to either the defendant or the department that the properties were uncontaminated. See General Statutes § 22a-134. The defendant also asserts that the plaintiff represented in the contract

that there were no violations of governmental rules or regulations as of the closing date and that, to the best of its knowledge, the properties were being managed in accordance with all applicable hazardous waste regulations. The defendant contends, nevertheless, that it presented evidence that three weeks prior to the execution of the contract, a department investigator inspected the properties and found that Royal Metals had failed to file certain required analyses of materials being processed on the properties.

We need address only the defendant's arguments concerning environmental issues because the defendant fails to challenge the trial court's determination that the plaintiff's holdover tenancy did not constitute a violation of CUTPA.[5] Moreover, while the plaintiff distinguishes the benefits in the lease from those in the contract, we note that the trial court determined that the contract, lease, note and mortgage are interdependent. The plaintiff does not challenge that determination. "Where there are multiple writings regarding the same transaction, the writings should be considered together to determine the intent of the parties." *Mongillo* v. *Commissioner of Transportation*, 214 Conn. 225, 229, 571 A.2d 112 (1990).

General Statutes § 42-110g (a) provides: "Any person who suffers *any ascertainable loss* of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action in the judicial district

---

[5] The trial court determined that the plaintiff's nonenvironmental breaches of the lease did not constitute a violation of CUTPA because they occurred with the defendant's "knowledge . . . while [the defendant] was negotiating direct leases with Royal Metals and other subtenants [as well as an extension of] the note and mortgage [with the plaintiff]. Thus, this conduct cannot be considered unfair or deceptive." In support of its holding, the trial court cited *Caldor, Inc.* v. *Heslin*, 215 Conn. 590, 597, 577 A.2d 1009 (1990), cert. denied, 498 U.S. 1088, 111 S. Ct. 966, 112 L. Ed. 2d 1053 (1991), and *McLaughlin Ford, Inc.* v. *Ford Motor Co.*, 192 Conn. 558, 568, 473 A.2d 1185 (1984). We do not pass on the merits of this holding.

in which the plaintiff or defendant resides or has his principal place of business or is doing business, to recover actual damages. . . ." (Emphasis added.) "Whenever a consumer has received something other than what he bargained for, he has suffered a loss of money or property. That loss is ascertainable if it is measurable even though the precise amount of the loss is not known." *Hinchliffe* v. *American Motors Corp.*, 184 Conn. 607, 614, 440 A.2d 810 (1981).

The trial court essentially found as facts the defendant's allegations concerning the environmental condition of the property. The court, nevertheless, determined that the defendant received the properties for which it bargained. The court held: "Just as [the defendant] bargained to impose responsibility for any environmental problems upon [the plaintiff], so too [the defendant] bargained to protect itself in the event that [the plaintiff] failed to do so." The court further noted that "the note and lease give [the defendant] the right to offset the actual costs of curing such defaults from the balance due under the note. Thus, when negotiating for the property, [the defendant] contemplated the possibility that [the plaintiff] might default on its environmental obligations and that [the defendant] might be required to cure those defaults. [The defendant] contractually ensured that in such event it could do so without facing liability or expense and without diminution in the property value because of environmental issues."

The defendant argues that "[i]t did not bargain for premises which were contaminated or polluted but which it could clean up at no cost to itself." We agree with the trial court, however, that the parties clearly contemplated the transfer of environmentally contaminated properties. The defendant has failed to identify

any provisions of the documents, or other evidence, relating to this transaction that would demonstrate otherwise.

## III

The defendant next claims that the trial court improperly determined that the plaintiff's breaches of the contract of sale and the lease were not material breaches. The defendant, therefore, argues that the court improperly rejected its third special defense, which would have excused the defendant from further performing its obligations under the contract and the lease.[6] We find no merit in the defendant's claim.

The trial court noted that the defendant alleged that the plaintiff breached the lease by failing to surrender the premises when the lease expired, by continuing to sublet the premises after the lease expired, by failing to perform the remedial work recommended in the environmental site assessments before the lease expired, by failing to keep the property free of nuisances and by failing to comply with all orders, regulations, rules and requirements of the government. The court further noted that the defendant alleged that the plaintiff breached the contract by representing that, at the time of closing, no violations of government rules, regulations or limitation existed, by representing that any hazardous waste on the premises was being managed in accordance with all applicable regulations and by failing to furnish a negative declaration.

In *Bernstein* v. *Nemeyer*, 213 Conn. 665, 672, 570 A.2d 164 (1990), our Supreme Court approved the multifactor standards for materiality contained in § 241 of the

---

[6] Section 237 of Restatement (Second), Contracts, provides in pertinent part: "[I]t is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time."

Restatement (Second) of Contracts. "In determining whether a failure to render or to offer performance is material, the following circumstances are significant: (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; [and] (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing." 2 Restatement (Second), Contracts § 241 (1981).

The defendant concedes that the trial court analyzed the proper allegations and correctly stated the applicable law. The only issue, therefore, is whether the trial court's finding that the breaches, if proven, were not material was clearly erroneous in light of the evidence and the pleadings in the record as a whole. Practice Book § 4061; *Bernstein* v. *Nemeyer*, supra, 213 Conn. 670.

The trial court found that the criteria set forth in (a), (b) and (d) of § 241 are dispositive of this issue. "As previously discussed, [the defendant] was not and could not have been deprived of the benefit it reasonably expected under the contract or the pertinent provisions of the lease. The benefit came in two alternative forms: it was either a property which [the plaintiff] had investigated and remediated in accordance with the contract and lease, or; alternatively, a property that [the defendant] could own without risk of liability and could investigate and remediate without cost to itself. As noted . . . by virtue of the offset and indemnification provisions in the documents, [the defendant] was protected from

environmental liability and could remedy any contamination at [the plaintiff's] sole expense." The trial court also determined that the alleged breaches of the lease were not material according to the criterion in (b) of § 241 because the defendant never commenced a summary process action to evict the plaintiff and recover possession of the properties.

The plaintiff argues that the evidence in the present case is similar to the evidence in *Bernstein* v. *Nemeyer*, supra, 213 Conn. 672, and that, because the Supreme Court held in that case that the trial court improperly concluded that the breaches were incidental rather than material, we should also so hold. We do not agree that the present case is controlled by *Bernstein*.

In that case, the trial court found that the defendants breached a negative cash flow guarantee that was part of a partnership agreement. Id., 670. Pursuant to the agreement, the defendants agreed to lend to the partnership the amount by which outlays exceeded receipts. Id., 667. The trial court determined that the defendants' breach of the agreement was not material because the guarantee was incidental to the contract as a whole, the plaintiffs' losses resulted from the failure of the real estate market rather than the defendants' breach and the plaintiffs received the tax benefits that were a central part of the bargain despite the breach. Id., 669. Our Supreme Court disagreed and concluded that "the most important factors are that the defendants' breach deprived the plaintiffs of a substantial benefit for which they had clearly bargained and which they had every reason to expect, and that the defendants' breach was totally incurable . . . ." Id., 672.

In part II of this opinion, we concluded that the trial court properly found that the plaintiff, in failing to meet its environmental obligations, did not deprive the

defendant of a benefit that it reasonably expected. This conclusion was based on the reasoning that the parties clearly contemplated that the plaintiff would be responsible for any environmental contamination of the properties and the defendant would be able to offset any costs associated with remedying the contamination. The breaches of the contract in the present case, therefore, are clearly distinguishable from those in *Bernstein* v. *Nemeyer*, supra, 213 Conn. 672. Moreover, we agree with the trial court that the plaintiff's failure to surrender possession of the properties at the end of the lease did not constitute a material breach because the defendant could have commenced a summary process action to regain possession of the properties.[7] See 2 Restatement (Second), supra, § 241 (b) and (c).

The standard of materiality must "be applied in the light of the facts of each case in such a way as to further the purpose of securing for each party his expectation of an exchange of performances. [Section 241] therefore states circumstances, not rules, which are to be considered in determining whether a particular failure is material." Id., § 241, comment (a). Under the circumstances, we conclude that the trial court's findings are not clearly erroneous.

## IV

The defendant claims finally that the trial court improperly granted the plaintiff's motion to strike its jury claim. After the defendant filed an answer, including special defenses, and a counterclaim, consisting of four counts, it submitted a claim for a jury trial. The

---

[7] The trial court found: "At one point, [the defendant] specifically instructed subtenants to pay rent to [the plaintiff] and although, according to Malkin's testimony, nothing prevented it, [the defendant] never commenced a summary process action to evict [the plaintiff] to recover possession of the propert[ies]. Consequently, there is no issue of compensation to [the defendant] for any lost benefit."

plaintiff responded by filing a motion to strike the case from the jury docket, and the trial court granted the motion. The defendant argues that it was entitled to a jury trial of four of its special defenses and two counts of its counterclaim. We agree with respect to the two challenged counts of the defendant's counterclaim.

First, we note that the plaintiff brought a foreclosure action. Such actions are equitable in nature and, therefore, do not give rise to a right to a jury trial under article first, § 19, of the Connecticut constitution. See *Northeast Savings, F.A.* v. *Plymouth Commons Realty Corp.*, 229 Conn. 634, 641, 642 A.2d 1194 (1994); *Skinner* v. *Angliker*, 211 Conn. 370, 374, 559 A.2d 701 (1989); *Texaco, Inc.* v. *Golart*, 206 Conn. 454, 458, 538 A.2d 1017 (1988); *Reynolds* v. *Ramos*, 188 Conn. 316, 320, 449 A.2d 182 (1982). The defendant asserts, however, that it raised issues of law in its special defenses and its counterclaim that require a determination by a jury.

" 'When legal and equitable issues are combined in a single action, whether the right to a jury trial attaches depends upon the relative importance of the two types of claims. "Where incidental issues of fact are presented in an action essentially equitable, the court may determine them without a jury in the exercise of its equitable powers. *Doris* v. *McFarland*, 113 Conn. 594, 608, 156 Atl. 52 [1931]. Where, however, the essential basis of the action is such that the issues presented would be properly cognizable in an action of law, either party has a right to have the legal issues tried to the jury, even though equitable relief is asked in order to give full effect to the legal rights claimed; *Berry* v. *Hartford National Bank & Trust Co.*, 125 Conn. 615, 618, 7 Atl. (2d) 847 [1939]; *LaFrance* v. *LaFrance*, 127 Conn. 149, 152, 14 Atl. (2d) 739 [1940] . . . ." *National Bank of*

*Commerce* v. *Howland*, 128 Conn. 307, 310, 22 A.2d 773 (1941).' " *Northeast Savings, F.A.* v. *Plymouth Commons Realty Corp.*, supra, 229 Conn. 641.

In its first and fourth special defenses, the defendant alleged that because of the plaintiff's failure to perform its obligations under the lease, it could not be defaulted and was prevented from performing under the terms of the note and mortgage. In its second and third special defenses, the defendant alleged that it was excused from performance of any of its own obligations under the note and mortgage because of the plaintiff's failure to perform its obligations under the contract and the plaintiff's breach of representations and warranties in the contract.

Warranty actions have always been triable by a jury. *Motor Vehicles Manufacturers Assn. of the United States, Inc.* v. *O'Neill*, 203 Conn. 63, 77, 523 A.2d 486 (1987). Likewise, breach of contract claims are also cognizable at law. See *Northeast Savings, F.A.* v. *Plymouth Commons Realty Corp.*, supra, 229 Conn. 642. We do not agree with the defendant, however, that its special defenses changed the basic, equitable nature of the plaintiff's foreclosure action. The defendant's special defenses, rather, fall among the many relevant circumstances that a trial court may consider in order to ensure that complete justice is done. See *Reynolds* v. *Ramos*, supra, 188 Conn. 320.

We, nevertheless, agree with the defendant that the trial court improperly denied it the right to a trial by jury of the two counts of its counterclaim alleging breach of contract, breach of lease and fraudulent inducement.[8]

---

[8] Many of the allegations of the special defenses and the first and second counterclaims are closely intertwined. Nonetheless, there are distinct claims remaining for jury trial apart from the issues that the trial court properly resolved in deciding the foreclosure action.

As to count one, "[f]raud in the inducement of a contract ordinarily renders the contract merely voidable at the option of the defrauded party, who also

"Because a counterclaim is an independent action; see *Home Oil Co.* v. *Todd*, 195 Conn. 333, 341, 487 A.2d 1095 (1985); the question presented is whether the defendants' counterclaim is essentially legal or essentially equitable. See *Franchi* v. *Farmholme, Inc.*, [191 Conn. 201, 211, 464 A.2d 35 (1983)]; *Flanigan* v. *Foley*, 20 Conn. Sup. 12, 13, 119 A.2d 741 (1955). This analysis must be performed in the context of the pleadings when read as a whole. *Franchi* v. *Farmholme, Inc.*, supra. The form of the relief demanded is not dispositive. *Fitzgerald* v. *Sullivan*, 12 Conn. Sup. 206, 206–207 (1943).' *United States Trust Co.* v. *Bohart*, 197 Conn. 34, 45, 495 A.2d 1034 (1985)." (Internal quotation marks omitted.) *Northeast Savings, F.A.* v. *Plymouth Commons Realty*, supra, 229 Conn. 641–642.

In the counterclaim, the defendant alleged in the first count that, on the basis of the false representations and warranties made by the plaintiff in the contract and lease, the defendant was induced to execute the note and mortgage. As a result, the defendant further alleges, the defendant purchased other property and "undertook an enormous commitment of labor and capital in an effort to develop a large commercial project known as 'Metro Plaza II' . . . [and] the defendant has suffered and continues to [suffer] great damage." In the

---

has the choice of affirming the contract and suing for damages. *Davidson* v. *O'Connell*, 114 Conn. 116, 122, 158 A. 207 [1932]; 37 Am. Jur. 2d, Fraud and Deceit, § 327 [1968]. If he pursues the latter alternative, the contract remains in force . . . ." *A. Sangivanni & Sons* v. *F. M. Floryan & Co.*, 158 Conn. 467, 472, 262 A.2d 159 (1967). In this case, the defendant chose to seek damages rather than to void the transaction. Accordingly, the first count of the counterclaim raises issues that are factually and legally distinguishable from the special defenses.

In count two of the counterclaim, the defendant sought damages for breach of the contract and lease. In deciding the issues raised by the special defenses, the trial court ruled on various aspects of the claimed breach of contract and lease. None of those determinations, however, preclude a future resolution of the issue of whether breaches, in fact, occurred thereby entitling the defendant to damages.

second count, the defendant alleged that "[a]s a consequence of the plaintiff's breaches of the provisions of the contract and lease . . . the defendant has suffered and continues to suffer great damage."

The trial court held that the "motion to strike from the jury docket is granted because this is a foreclosure action, and the defendant cannot by the assertion of special defenses and counterclaims containing several 'legal' causes of action convert the case from its essential equitable nature to a legal cause of action." The trial court correctly noted that the plaintiff pleaded legal issues, but did not analyze the counterclaims as independent actions. Because counts one and two of the defendant's counterclaim are essentially legal in nature, however, the defendant must be afforded a jury trial on those two counts.[9]

The judgment is reversed only as to counts one and two of the defendant's counterclaim, and the case is remanded for further proceedings in accordance with this opinion.

In this opinion the other judges concurred.

---

[9] We note that the defendant is entitled to a jury trial on two counts of his counterclaim, even though the trial court properly determined that the defendant would not be excused from performance if the defendant proved its allegations. "When a breach of contract occurs, '[t]he contract is not put out of existence, though all further performance of the obligations of the parties may cease. It survives for the purpose of measuring the claims arising out of the breach . . . .' " *Rokalor, Inc.* v. *Connecticut Eating Enterprises, Inc.*, 18 Conn. App. 384, 392, 558 A.2d 265 (1989), quoting *Batter Building Materials Co.* v. *Kirschner*, 142 Conn. 1, 10, 110 A.2d 464 (1954); see also *CMG Realty of Connecticut, Inc.* v. *Colonnade One Ltd. Partnership*, 36 Conn. App. 653, 666, 653 A.2d 207 (1995).