## STATE OF CONNECTICUT v. LEX ASSOCIATES
### (SC 15902)

Callahan, C. J., and Berdon, Norcott, Katz and Peters, Js.

Argued January 15—officially released May 11, 1999

*Elliott B. Pollack,* with whom were *Christopher M. Haddad* and, on the brief, *Gregory F. Servodidio,* for the appellant-appellee (defendant).

*Peter R. Huntsman,* assistant attorney general, with whom, on the brief, was *Richard Blumenthal,* attorney general, for the appellee-appellant (plaintiff).

*Opinion*

PETERS, J. Many long-term real estate leases include provisions giving the lessees the option to purchase the leased properties. In the present appeal, the principal issues concern the consequences that flow from a lessor's unexcused refusal to accept a lessee's proper tender of payment of the option price. An antecedent issue is the enforceability of the option to purchase in light of a claimed lack of mutuality of obligation in the underlying lease.

The plaintiff, the state of Connecticut, department of public works (state), brought an amended action for specific performance to compel the defendant, Lex Associates (Lex), to convey to the state the real property with respect to which the state had exercised an option to purchase. Lex filed an answer challenging the validity and enforceability of the option agreement and a counterclaim asserting a right to recover further payments from the state. Agreeing that no material facts were in dispute, the parties submitted cross motions for summary judgment. The trial court granted the state's motion for summary judgment and denied the motion by Lex. The court held that the state was entitled to specific performance of its right to a conveyance of the property. The court required the state, however, to pay Lex interest on the purchase price and to reimburse

Lex for pendente lite costs for some municipal tax liens and sewer charges.

Lex appealed from the judgment challenging the order of specific performance and the rejection of certain of its monetary claims, particularly claims for rental payments or payments for the use of the property pendente lite. The state cross appealed from the judgment challenging the interest and lien costs imposed by the trial court. Pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c), we transferred the matter from the Appellate Court to this court. We affirm the judgment on the appeal by Lex, but reverse the judgment on the state's cross appeal.

I

FACTUAL AND PROCEDURAL HISTORY

The facts were stipulated by the parties to be as follows. On August 22, 1969, the state entered into a lease with Lex' predecessor in title. The lease related to designated property in Vernon that is used as a courthouse. The lease contained an option to purchase.

Subsequently, after the state withheld rent because of a disagreement with Lex about its maintenance of the property, Lex brought an action of summary process against the state. In that case, the court determined, inter alia, that Lex was barred by sovereign immunity from pursuing such a claim in the Superior Court. *Lex Associates* v. *State*, 35 Conn. Sup. 180, 185, 402 A.2d 804 (1978).[1] Lex took no appeal from that judgment. Despite earlier indications that Lex might pursue a claim for relief before the claims commissioner pursuant to General Statutes § 4-142, Lex sought no further remedy of any kind against the state.

---

[1] In *Lex Associates* the court also discussed and rejected another claim for relief that has no relevance to the present case.

On December 5, 1980, the parties amended the lease. The amended lease included a revised schedule of purchase prices for the exercise of the state's option to purchase at various stated times. It also set forth the obligations of the parties in the event that the state elected to exercise its option.

Having decided to exercise the purchase option, on August 15, 1990, the state gave notice to Lex by certified mail. The letter advised Lex that October 15, 1990, was the designated day for the closing. Lex did not attend the closing. Despite the absence of Lex, the state appeared with a valid check for $395,000,[2] the amount stipulated in the amended lease. The state remained in possession of the real property, but Lex never conveyed title to the state. Throughout these proceedings, the state has continued to be ready, willing and able to purchase the property in accordance with its exercise of the option to purchase.

Although, on November 27, 1990, the state promptly filed an action, for specific performance, during the pendency of that action the state continued to make payments to Lex. It paid Lex a total of $398,142, an amount in excess of the purchase price of $395,000. The state characterized these payments as a setoff against the purchase price, while Lex characterized them as rent owed to Lex because of the state's continued use of the property pendente lite.

Almost six years after the unsuccessful attempt to have a closing, the parties agreed to resolve their dispute by the filing of cross motions for summary judgment based on a stipulation of facts, an amended complaint and an answer filed that same day. The trial

---

[2] To fund the tender of payment, the state issued tax exempt bonds in the amount of $460,000, paying interest at 5.25 percent a year. As tax exempt bonds, they are revenue neutral. The state has made no money from the issuance of the bonds.

court granted the state's motion and denied Lex' motion. It allocated the pendente lite payments to the state as a setoff to the purchase price but awarded monetary relief to Lex in the form of interest on the purchase price as well as partial recovery of liens and interest arising out of unpaid municipal charges assessed against Lex as the title owner of the property.

In their appeals to this court, the arguments of the parties mirror those that they raised at trial. In its appeal, Lex claims that the trial court improperly concluded that the state had a right: (1) to enforce the lease and the purchase option despite Lex' claim that the lease was not supported by adequate consideration because of an alleged lack of mutuality of obligation; (2) to set off, against the purchase price, its pendente lite payments to Lex, despite Lex' claim that those payments were either rental payments or payments for use and occupancy of the property; and (3) to pay only part of the real estate taxes that Lex had paid pendente lite. In its cross appeal, the state claims that the trial court improperly awarded to Lex: (1) interest on the descending balance of the purchase price; and (2) part of the unpaid interest and liens on municipal tax and sewer charges. We affirm the judgment of the trial court with respect to Lex' appeal, but reverse with respect to the state's cross appeal.

## II

## THE APPEAL BY LEX

The issues raised by Lex' appeal challenge both the validity and enforceability of the state's option to purchase and the monetary consequences attached thereto. We will consider each claim separately.

## A

Lex argues that its refusal to participate in the closing and to accept the state's tender was justifiable because,

according to Lex, the lease agreement and the option contained therein are unenforceable. It contends that the state's promises to pay, and its payments in fact, for all the years that it was a lessee, are not adequate consideration for Lex' promise to convey the property upon the exercise of the state's option to purchase.

The state's promises are illusory, according to Lex, because the state's contractual obligations to Lex are unenforceable in a court of law. Lex premises its argument on *Lex Associates* v. *State*, supra, 35 Conn. Sup. 185, in which the court concluded, on sovereign immunity grounds, that Lex could not pursue a summary process claim against the state for alleged nonpayment of rent. Lex asserts that a promise that it cannot enforce by a summary process action in the Superior Court is not a binding promise for any purpose. In Lex' view, in light of the absence of judicially enforceable counterpromises by the state, the lease lacks mutuality of obligation in its entirety and is a "nudum pactum" that is not enforceable against Lex. The trial court rejected this argument. For three reasons, we agree with the trial court.

First, we disagree with Lex' claim of a demonstrated lack of mutuality of obligation.[3] Lex argues that the lease, and consequently the option, cannot be enforced against it because it cannot enforce its rights against the state in a judicial forum. Potential access to a monetary recovery from the claims commissioner does not fill the gap, according to Lex, because that remedy is limited in scope and less reviewable than a judicial remedy would be. In Lex' view, taken as a whole, the entire lease agreement lacks mutuality of obligation.

Because Lex did not appeal from the judgment in *Lex Associates*, the record does not establish definitively

---

[3] In its reply brief, Lex clarifies that its argument is premised on an alleged lack of mutuality of obligation, rather than a lack of mutuality of remedy.

whether the principle of sovereign immunity barred judicial enforcement of the state's obligations to Lex. Even if *Lex Associates* had been affirmed, however, Lex has cited no authority, and we know of none, standing for the proposition that recourse to the claims commissioner is an inadequate remedy as a matter of law. We reject the implied assertion that the claims commissioner would not resolve fairly a dispute against the state.[4]

Second, the alleged inadequacy of one untested remedy neither deprives a contract of mutuality of obligation nor establishes inadequacy of consideration. "The doctrine of consideration does not require or imply an equal exchange between the contracting parties. That which is bargained-for by the promisor and given in exchange for the promise by the promisee is not made insufficient as a consideration by the fact that its value in the market is not equal to that which is promised. Consideration in fact bargained for is not required to be adequate in the sense of equality in value. . . . The general rule is that, in the absence of fraud or other unconscionable circumstances, a contract will not be rendered unenforceable at the behest of one of the contracting parties merely because of an inadequacy of consideration." (Citations omitted; internal quotation marks omitted.) *Osborne* v. *Locke Steel Chain Co.*, 153 Conn. 527, 532–33, 218 A.2d 526 (1966); see 1 Restatement (Second), Contracts § 79, p. 200 (1981) ("[i]f the requirement of consideration is met, there is no additional requirement of . . . 'mutuality of obligation' "); see also 1 A. Corbin, Contracts (1963) § 127; 3 S. Williston, Contracts (4th Ed. 1992) § 7:21, p. 383.

---

[4] We note the state's citation of two cases in which the claims commissioner awarded a claimant substantial sums of money to be paid by the state. See *In the Matter of a Claim against the State of Connecticut by Samuel H. Cohen*, File No. 12629 (January 6, 1993); *In the Matter of a Claim against the State of Connecticut by Security Building Co.*, File No. 12466 (April 1, 1993). Both cases concern claims arising out of the state's breach of its obligations to make payments in accordance with a lease.

Furthermore, this contract generated substantial benefits for Lex prior to Lex' challenge of its validity. Before exercising its option to purchase, the state had made rental payments to Lex in substantial amounts.[5] "Even contracts considerably more executory than the present contract, even contracts with substantial unilateral rights of cancellation or of termination, are not totally void for lack of mutuality once there has been some performance that makes up for possible defects in the consideration." *Constitution Bank & Trust Co.* v. *Robinson*, 179 Conn. 232, 235, 425 A.2d 1268 (1979); *Gurfein* v. *Werbelovsky*, 97 Conn. 703, 706, 118 A. 32 (1922); 1A A. Corbin, supra, §§ 162, 163.

Third, even if, in 1978, the judgment in *Lex Associates* had cast a significant shadow on the adequacy of Lex' remedies against the state, Lex waived any claim in that regard by agreeing to an amended lease in 1980.[6] At oral argument in this court, Lex conceded that a party fully apprised of a possible problem of mutuality could waive such a claim contractually. Lex cannot now assert that, although *Lex Associates* had alerted it to the issue of mutuality, it could expressly reaffirm its contract obligations to the state while silently retaining its lack of mutuality defense.[7]

[5] The state represents, in its brief, that it made rental payments of approximately $2,000,000 from September, 1969, to October 15, 1990. Lex has not challenged the accuracy of this representation.

[6] Lex has not raised any specific claim of impropriety with respect to the negotiation of the amended lease. There is no basis in the record to support the representations in Lex' reply brief that the state was "an uncooperative and troublesome tenant" or that Lex found itself in "an otherwise horribly one-sided situation." If these representations are intended to suggest that Lex was acting under duress, that claim was neither raised nor adjudicated at the trial in this case.

[7] It is disingenuous for Lex to argue that nothing in the record supports a finding that the parties intended, in the amended lease, to resolve the mutuality issue, among others. An affidavit filed by one of Lex' partners in support of Lex' motion for summary judgment stated: "In the wake of Judge Hennessy's decision [in *Lex Associates* v. *State*, supra, 35 Conn. Sup. 180]

We conclude, therefore, that the trial court ruled properly in concluding that Lex was bound by the terms of the lease. The validity of the purchase option has not been questioned for any other reason. The state exercised its right to purchase the property by tendering the purchase price at a properly noticed closing that Lex did not attend. Lex' unexcused nonperformance of its corresponding contract obligation to convey the property was a material breach of its contractual duty to the state. As the trial court properly concluded, the state was entitled to specific performance of the option contract.

## B

After Lex' unexcused dishonor of its contract obligations, the state remained in possession of the courthouse property. Although the state sought judicial relief promptly, for reasons that the record does not disclose, the state continued to make pendente lite payments to Lex. The state terminated these payments when, in their totality, they exceeded the amount of the option purchase price. Lex claims that it was entitled to keep these payments as further payments under the lease. The state argues, and the trial court agreed, that these payments should be treated as a setoff against the purchase price that Lex, without legal excuse, had refused to accept. We agree with the state and the trial court.

Once the state had properly exercised its option and had properly tendered the purchase price to Lex, the state became the equitable owner of the courthouse property. Its ownership rights superseded and replaced its former leasehold obligations. That result follows from the logic of the situation. A lessor cannot retain a continued right to lease payments when those payments were made subsequent to the lessor's unexcused refusal

and as part of an effort to attempt to resolve their disputes, the parties entered into an amendment to the lease as of December 5, 1980."

to accept a proper tender of payment in full. Otherwise, any lessor who regretted the terms of an option contract could disregard the exercise of the option and continue to collect rents until the end of the lease. In other words, the defaulting lessor could reap an economic gain from its own misconduct.

Nothing in our law supports such a construction of the relationship between a lessor who contractually provides an option to purchase and a lessee who properly exercises its option rights. If such a lessor refuses proper tender of payment, a likely result, as in this case, is that the former lessee and present equitable owner will remain in possession of the property pending the rendering of a judgment of specific performance. As we held in *Heyman* v. *CBS, Inc.*, 178 Conn. 215, 220, 423 A.2d 887 (1979), a person who validly exercises an option and properly tenders the option price has "duly performed all of the conditions to be performed on its part, and as of that date became the equitable owner of the property." We went on to hold that an equitable owner of real property had no further obligation to make rental payments. Id., 224.

For two reasons, Lex disputes the applicability of *Heyman* under the circumstances of this case. Lex focuses first on the language of our opinion and then on the terms of its lease. Neither argument is persuasive.

With respect to our opinion in *Heyman*, we held that the former lessee, having exercised its option to purchase, was entitled to discharge from further rental obligations both because the contract so provided and because such rights attached to its status as an equitable owner. Id., 224. Contrary to Lex' assertion, we did not hold, and we decline to hold today, that only express contract provisions entitle an option holder to stop rental payments after a proper exercise of an option to purchase by a proper tender of payment.

With respect to the terms of the present lease, it is true that, in paragraph ten, the parties expressed their intent that, in the interval between the exercise of the purchase option and the delivery of the deed, "[a]ll rentals . . . shall be prorated between grantor and grantee . . . ."[8] That sentence must, however, be read in context. In the immediately preceding sentence, the lease required Lex, after the tender of the purchase price, "promptly" to deliver a deed to the state. Nothing in the record supports Lex' argument that paragraph ten of the lease purports to address the consequences of Lex' unexcused and protracted delay in performing its contract obligations.[9]

Finally, Lex claims that it would be inequitable to require Lex to transfer the property at issue to the state "without receiving full payment of the option price," a sum that, according to Lex, should include all rentals payable before delivery of title to the state.[10] Relying

---

[8] Paragraph ten describes the option provision in the lease. It provides that, upon receipt of notice of the state's election to exercise its option rights, Lex immediately became obligated to deliver to the state, for its examination, an abstract of title and a geographical survey of the property. "Upon completion of such examination, if title is found satisfactory, and upon tender of the purchase price to the Lessor, the Lessor shall promptly deliver to the Lessee a good and sufficient warranty deed conveying the premises to the Lessee free and clear of all encumbrances. All rentals and taxes shall be prorated between grantor and grantee . . . ."

[9] The state's tender of the purchase price in this case distinguishes it from the cases on which Lex relies. In *Powertest Corp.* v. *Evans*, 665 F. Sup. 134, 141 (D. Conn. 1986), the court noted expressly that the party exercising its option had not parted with the purchase price. Because the state not only exercised its option but also kept its tender of payment good throughout the six year litigation of this case, it would be manifestly unjust not to deem the state's tender to be the functional equivalent of payment of the purchase price. *Parkway Trailer Sales, Inc.* v. *Wooldridge Bros., Inc.*, 148 Conn. 21, 26–27, 166 A.2d 710 (1960), contains nothing to suggest that a right to rental payments would survive a proper tender of payment pursuant to an option to purchase.

[10] Nowhere in the proceedings on appeal has Lex advanced a claim that the state's failure to notify Lex about the intended purpose of the payments is itself a ground for equitable relief.

on the contract language quoted previously, Lex argues that, pendente lite, the state had no more rights than a holdover tenant. From these assumptions, Lex reasons that to consider the state's payments as a setoff would result in a disproportionate forfeiture of Lex' right to rental payments and would "punish" Lex "for no reason whatsoever."

The flaw in this argument is that Lex is not being punished "for no reason whatsoever." Lex' claimed entitlement to equitable relief cannot survive the conclusion that Lex' refusal to accept the state's tender of payment was an unexcused and material breach of its own contract obligations to the state. As long as the state kept its tender of payment open, Lex' material breach discharged the state from any further obligations under the lease, including its erstwhile obligation to make further rental payments to Lex. See 2 Restatement (Second), Contracts §§ 237, 242 (1981).[11] Contrary to Lex' contention, the validity of the lease in this case forecloses any argument of misconduct on the part of the state. The misconduct that precipitated this action is Lex' own unexcused failure to honor its contract obligations.

Lex is mistaken in analogizing the position of the state, after its valid exercise of a valid option, to that of a holdover tenant. The state's right to specific performance in no way resembles the rights of a holdover tenant who, upon the expiration of a lease, has no further possessory rights to the property. See, e.g., *669 Atlantic Street Associates* v. *Atlantic-Rockland Stam-*

---

[11] Lex also argues that, in addition to its claimed entitlement to retain payments that it characterizes as rental payments, it is further entitled to additional payments reflecting an alleged difference between the rental payments and the fair market value for the state's use of the courthouse property. Among other reasons for dismissing this claim is the fact that Lex has cited to nothing in the record at trial that would support such a claimed discrepancy.

*ford Associates*, 43 Conn. App. 113, 121, 682 A.2d 572, cert. denied, 239 Conn. 949, 950, 686 A.2d 126 (1996).

Under the circumstances of the present case, therefore, we agree with the state that the trial court properly credited the postclosing payments against the purchase price. The state kept its tender open by selling income-neutral state bonds. Lex' answer to the state's complaint admits that the state " 'was at all times and still is ready, willing and able to perform . . . .' " The state's pendente lite payments to Lex throughout the course of this protracted litigation do not diminish the rights that accrued to the state on October 15, 1990, the date of the tender of payment. Having demonstrated its right to specific performance of Lex' promise to convey title, the state had a right to be placed, as nearly as practicable, in the same position as if Lex had performed its contract obligations in timely fashion. *Lombardi* v. *Laudati*, 124 Conn. 569, 576, 200 A. 1019 (1938); *Atwood* v. *Vincent*, 17 Conn. 575, 581–82 (1846); 3 E. Farnsworth, Contracts (2d Ed. 1998) § 12.5, p. 165. But for Lex' unexcused refusal to convey title on October 15, 1990, Lex would have had no possible claim to further payments from the state. Lex' own breach of contract cannot entitle it to keep such payments now.

In sum, because Lex' unexcused refusal to accept the state's tender of full payment on October 15, 1990, was a material breach of a valid lease contract, Lex cannot recover as rents any payments to which it would not have been entitled had it honored its contract obligations properly and promptly. The trial court properly rejected Lex' characterization of the pendente lite payments as rental payments.

C

Our disagreement with Lex' claim with regard to alleged rental payments is largely dispositive of its claim for payments representing the reasonable value of the

state's use and occupancy of the property pendente lite. As we have held in part II B, after an unexcused breach of Lex' contract obligations with respect to the option, the state, on October 15, 1990, became an equitable owner of the property, and not, as Lex argues, a holdover tenant.

The cases on which Lex relies as contrary authority do not support Lex' argument. It is true that *Parkway Trailer Sales, Inc.* v. *Wooldridge Bros., Inc.*, 148 Conn. 21, 166 A.2d 710 (1960), also dealt with the validity of the exercise of an option to purchase contained in a lease. In that case, however, as the trial court observed, the person seeking specific performance had failed to exercise its option rights during the period of the leasehold or immediately upon its termination. Id., 23–25. The relevant part of the vendor's argument, on appeal from a judgment of specific performance, claimed that, under such circumstances, continued rental payments constituted a waiver of any further right to exercise the option. Id., 25. *Parkway Trailer Sales, Inc.*, contains no adjudication of any monetary claims. We concluded only that there had been no waiver and, on that basis, affirmed the judgment of specific performance. Id., 27. Both the factual circumstances and the relevant legal issues distinguish *Parkway Trailer Sales, Inc.*, from the present case.

D

During the pendency of the present litigation, there was an assessment of local taxes on the property in the amount of $177,197.54. The final issue raised by Lex' appeal is the apportionment of liability for those taxes. Lex disputes the validity of the trial court's conclusion that the state is required to repay only an amount equivalent to the 20 percent "payments in lieu

of taxes" that would have measured the state's tax liability pursuant to General Statutes § 12-19a.[12]

Lex bases its argument on the text of § 12-19a, which addresses the tax liability of the state as owner of the property. Because in this case, pendente lite, the state was not yet the record owner of the property, Lex claims to be entitled to full reimbursement because the state could not have invoked the provisions of § 12-19a. In light of our holding that the state became the equitable owner of the property by tendering full payment on October 15, 1990, Lex' claim cannot be sustained. Lex did not have to make the tax payments. All it had to do was to honor its contract obligations by promptly conveying the property to the state. Lex' unexcused dishonor of the lease does not justify depriving the state of its privileged tax status. In effect, Lex paid taxes in excess of 20 percent as a volunteer. The trial court properly concluded that the state bears no responsibility to reimburse Lex in full.

## III

### THE STATE'S CROSS APPEAL

Our analysis of the issues raised in Lex' appeal has considerable bearing on the issues raised in the state's cross appeal. The state claims that, as equitable owner of the property after October 15, 1990, it had no liability

---

[12] General Statutes § 12-19a provides in relevant part: "(a) On or before January first, annually, the Secretary of the Office of Policy and Management shall determine the amount due, as a state grant in lieu of taxes, to each town in this state wherein state-owned real property . . . is located. The grant payable to any town under the provisions of this section in the state fiscal year commencing July 1, 1993, and each fiscal year thereafter, shall be equal to the total of . . . (4) subject to the provisions of subsection (c) of this section, twenty per cent of the property taxes which would have been paid with respect to all other state-owned real property . . . except for the exemption applicable to such property, on the assessment list in such town for the assessment date two years prior to the commencement of the state fiscal year in which such grant is payable. . . ."

for: (1) interest on the descending balance of the purchase price; or (2) part of the unpaid interest on municipal tax and sewer charges. Although the trial court ruled to the contrary, we agree with the state.

## A

The trial court awarded prejudgment interest to Lex in the amount of 8 percent from October 15, 1990, calculated on a declining basis as payments were made until the date when the balance had been paid in full. The court calculated the rate of interest that it awarded by reference to General Statutes § 37-1.[13] It is reasonable to infer that, substantively, it grounded its decision on our construction of similar terms in General Statutes § 37-3a.[14]

As the trial court noted, we have construed § 37-3a as permitting a trial court, in the exercise of its equitable discretion, to award prejudgment interest. *Blakeslee Arpaia Chapman, Inc.* v. *EI Constructors, Inc.*, 239 Conn. 708, 734–35, 687 A.2d 506 (1997). As the trial court also noted, a necessary predicate for such an award is, however, a determination that the party against whom interest is to be awarded "has wrongfully detained money due the other party . . . ." Id., 735. In this case, the trial court agreed with the state that the state's tender of the purchase price demonstrated that the state had not wrongfully detained money owed.

Despite the absence of any wrongful conduct on the part of the state, the trial court awarded interest to Lex.

[13] General Statutes § 37-1 provides: "(a) The compensation for forbearance of property loaned at a fixed valuation, or for money, shall, in the absence of any agreement to the contrary, be at the rate of eight per cent a year; and, in computing interest, three hundred and sixty days may be considered to be a year.

"(b) Unless otherwise provided by agreement, interest at the legal rate from the date of maturity of a debt shall accrue as an addition to the debt."

[14] General Statutes § 37-3a provides in relevant part: "Except as provided in sections 37-3b, 37-3c and 52-192a, interest at the rate of ten per cent a year, and no more, may be recovered and allowed in civil actions . . . ."

The trial court did not articulate how that result can be squared with the holding of *Blakeslee Arpaia Chapman, Inc.* The trial court previously had determined, and we have agreed, that the state's payments to Lex after October 15, 1990, were a setoff against the purchase price and, therefore, not funds to which Lex was entitled as a matter of law prior to its conveyance of the property to the state. None of those payments, therefore, was wrongfully detained by the state. The provisions of § 37-3a do not authorize an award of interest under the circumstances of this case.

Lex argues that, apart from the statute, the trial court's general equitable authority over the specific terms of an order of specific performance permitted the court to award interest to Lex. Although the trial court alluded to "equitable principles" in making its award, it did not explain why the factual record in this case entitled Lex to any prejudgment interest.[15] In the absence of any wrongdoing by the state, the best that can be said for Lex is that it entertained a good faith but mistaken belief that the option contained in the lease was unenforceable. Lex' mistake does not provide an equitable basis for an award of interest to it as compensation for its own delay in conveying title to the state.

It is true that, even though the state did not wrongfully withhold the purchase price from Lex, a tender of payment is not the equivalent of payment itself. Refusal of a tender of payment, however, while it does not discharge a debt, discharges any further accrual of interest if the purchaser keeps the tender good pendente lite. *Bronson* v. *Leibold*, 87 Conn. 293, 300, 87 A. 979 (1913); *Loomis* v. *Knox*, 60 Conn. 343, 352, 22 A. 771 (1891);

---

[15] Neither party asked the trial court to articulate the specific equitable principles that underlay its monetary awards. See Practice Book § 66-5, formerly § 4051.

see J. Calamari & J. Perillo, Contracts (3d Ed. 1987) § 21-12, p. 881; 5A A. Corbin, supra, §§ 1232 through 1235, pp. 518–33; 15 S. Williston, Contracts (3d Ed. 1972) §§ 1810 through 1816, pp. 420–42.

Lex has not challenged the state's factual representation that the state has paid 5 percent interest to state bond purchasers, presumably to avoid any claim that it has not kept its tender open during the pendency of this litigation.[16] That presumption is supported by Lex' admission, in its answer to the state's complaint, that the state " 'at all times and still is' " ready, willing and able to purchase the property. Nothing in the record suggests that the state's readiness to purchase the property, manifested by its tender of a check for the purchase price, ever became attenuated thereafter. If anything, the state's voluntary payments after October 15, 1990, demonstrate its continued readiness to pay the purchase price.[17]

Because neither § 37-3a nor general equitable principles support an award of interest to Lex under the circumstances of this case, the trial court had no authority to make such an award. Its judgment with respect to interest must, therefore, be reversed.

### B

The state's second argument in its cross appeal challenges the validity of the trial court's judgment concerning the state's partial liability for tax lien charges and unpaid sewer charges that accrued after October 15, 1990. The state concedes its liability for the sewer charges themselves, but it disputes its liability for one half of the interest and lien fees on the municipal taxes

---

[16] Lex has not challenged this factual assertion on appeal.

[17] Lex cites no authority for the proposition that, in addition to keeping its tender open, the state had an obligation to notify Lex of that fact. Aside from stating the proposition, Lex has offered no reasoned argument in its support. We, therefore, decline to consider its merits.

and sewer assessments that Lex failed to pay in a timely fashion. The state again relies on the argument, which we have found persuasive, that its liability to Lex became fixed on October 15, 1990, when Lex rejected the state's tender of payment. Accordingly, the state maintains, it bears no responsibility for further debts that Lex might have incurred thereafter. We agree with the state.

Except for the generic reference to applicable equitable principles, the trial court did not explain its reason for the award of the amounts in question to Lex. As the state contends, however, and as we have held in part II B of this opinion, the primary purpose of a decree of specific performance, which is always an equitable remedy, is to place an injured purchaser of property in a position that replicates, as nearly as possible, that which it would have enjoyed but for the vendor's unexcused breach. Without a showing by Lex that, in the absence of its own breach, the state would have incurred costs for interest and lien fees on unpaid municipal taxes and sewer assessments, Lex has no equitable claim to recover such costs. Lex has proffered no other equitably grounded basis for the trial court's award. Under these circumstances, we reverse the trial court's judgment requiring the state to pay one half of the interest and lien fees that were at issue.

The judgment is affirmed with respect to the issues raised on the appeal by Lex; the judgment is reversed with respect to the issues raised in the state's cross appeal and the case is remanded with direction to render judgment for the state thereon.

In this opinion CALLAHAN, C. J., and NORCOTT and KATZ, Js., concurred.

BERDON, J., concurring in part and dissenting in part. I agree with my colleagues in the majority that we should affirm the order of specific performance and

the other aspects of the trial court's judgment in favor of the plaintiff, the state of Connecticut. Unlike the majority, however, I also believe that we should affirm the trial court's award of interest in favor of the defendant, Lex Associates (Lex).

The majority acknowledges that "[t]he court calculated the rate of interest that it awarded by reference to General Statutes § 37-1." So far, so good. The majority goes on to assert, however, that "[i]t is reasonable to infer that, substantively, [the trial court] grounded its decision on our construction of similar terms in General Statutes § 37-3a." I do not find this inference even remotely plausible, let alone "reasonable." In order to reach the contrary result, the majority must conflate §§ 37-1 and 37-3a. These statutes are as different as apples and oranges. General Statutes § 37-3a—entitled "Rate recoverable as damages"—provides for interest at the rate of 10 percent as compensation "for the detention of money after it becomes payable. . . ." In other words, it compensates parties whose money has been wrongfully detained. That is what *Blakeslee Arpaia Chapman, Inc.* v. *EI Constructors, Inc.*, 239 Conn. 708, 734–35, 687 A.2d 506 (1997) (*Blakeslee*), was all about.[1] In the present case, the trial court did not rely upon either § 37-3a or *Blakeslee*. Instead, the court awarded interest under § 37-1, which does not involve the wrongful detention of funds. General Statutes § 37-1—entitled "Legal rate. Accrual as addition to debt"—provides for interest of 8 percent as "compensation . . . for money . . . in the absence of any agreement to the contrary . . . ." This provision compensates parties for the time value of money, which has nothing to do with wrongful

[1] To be scrupulously clear on this point, the language of *Blakeslee* quoted by the majority requires "a determination that the party against whom interest is to be awarded 'has wrongfully *detained money due the other party* . . . .' " (Emphasis added.) Although the diction differs somewhat, § 37-3a addresses the identical issue: "damages for the *detention of money after it becomes payable*. . . ." (Emphasis added.)

detention of funds.[2] If, as the majority assumes, wrongful detention of funds were a "necessary predicate" to an award of interest under § 37-1, then the legislature would have had no reason to enact § 37-3a.

Having dispensed with the majority's reliance upon § 37-3a, all that remains is the application of well settled principles: "[1] the determination of whether interest is a proper element of damages is to be made in view of the demands of justice, not through the application of any arbitrary rules . . . and [2] . . . the allowance of interest is primarily an equitable determination to be made within the discretion of the trial court." *Scribner* v. *O'Brien, Inc.*, 169 Conn. 389, 405–406, 363 A.2d 160 (1975). I see no reason to disturb the trial court's exercise of this discretion in favor of Lex.[3]

The majority emphasizes that "the state has paid 5 percent interest to state bond purchasers . . . ." The majority thus implies that the state sold these bonds in order to finance the purchase of the courthouse and then, like old Mother Hubbard, did nothing more with the money than put it in a sock. If this were true, then

---

[2] The difference between the two statutes is reflected in the different rates of interest. Section 37-1 compensates a party for the time value of money at 8 percent. Section 37-3a also compensates a party for the time value of money (at 8 percent), but then tacks on an additional 2 percent as a penalty for the wrongful detention of funds.

[3] The majority seems to fault Lex for failing to seek an articulation of "the specific equitable principles that underlay its monetary awards," pursuant to Practice Book § 66-5. In fact, the burden was on the state—the party that objected to the award—to seek such an articulation. See, e.g., W. Horton & S. Cormier, Rules of Appellate Procedure (1999) p. 159 ("In general it is the appellant's duty to invoke [§ 66-5] to make sure that the record is adequate for appellate review of the appellant's case. *Barnes* v. *Barnes*, 190 Conn. 491, 493, 460 A.2d 1302, 1304 [1983]; *Gerber & Hurley, Inc.* v. *CCC Corporation*, 36 Conn. App. 539, 543, 651 A.2d 1302, 1304 [1995]; *Manchester* v. *Zoning Board of Appeals*, 18 Conn. App. 69, 70, note 1, 556 A.2d 1026, 1026 [1989]; *Anderson* v. *Schieffer*, 35 Conn. App. 31, 45, 645 A.2d 549, 556–57 [1994] [motion denied without explanation]; *Gelormino* v. *Lieberman*, 36 Conn. App. 153, 649 A.2d 259, cert. denied, 231 Conn. 946, 653 A.2d 826 [1994] [judgment entered without explanation] . . . .").

it might cut against Lex' equitable claim to the interest awarded by the trial court. There is, however, absolutely no evidence in the record to support the majority's implication, and for good reason: it is simply preposterous. I take judicial notice of the fact that no rational treasurer of the state of Connecticut would emulate a fiscal squirrel. Instead, the treasurer is duty-bound to invest every available dollar.[4]

Finally, I would also affirm the trial court's equitable determinations with respect to the unpaid lien fees, taxes and sewer charges. In short, I see no reason to disturb the trial court's exercise of its sound discretion.

Accordingly, I concur in part and dissent in part.

---

[4] Ironically, the principal authority cited by the majority clearly supports the trial court's award of interest to Lex. In *Bronson* v. *Leibold*, 87 Conn. 293, 300–301, 87 A. 979 (1913), the court stated the unremarkable proposition that, if a mortgagor had not earned interest upon a tender, then he would not have been liable to his mortgagee for this interest. Because the threshold premise of this conditional proposition was untrue on the facts of *Bronson*, the court upheld the award of interest to the mortgagee. More fully, the court in *Bronson* explained that, "[a]s a general rule a tender by a mortgagor to his mortgagee after forfeiture will stop interest, though the mortgagee refuses to receive the tender. But the mortgagor must pay the money into court or keep the tender good. Hunt on Tender (1903 Ed.) §§ 346, 347; *Thayer* v. *Meeker*, 86 Ill. 470, 474 [1877]. If he holds the money tendered in hand, it is inequitable to compel him to lose the interest upon this, and thereafter, when his creditor is by the decree forced to accept it, be compelled to pay interest upon the tender. In this case the finding is that the defendant has been ready and willing to pay the amount of the tender, but the subordinate facts . . . indicate that the defendant has not had the money in hand, nor lost the interest upon the amount tendered. The trial court no doubt concluded that it would be inequitable to permit the defendant to retain possession, lose no interest on the tender, and force the plaintiff to lose possession and interest. We cannot say that it was inequitable under the situation presented in this case to add interest upon the amount of the tender." *Bronson* v. *Liebold*, supra, 300–301. Because the pertinent facts of the present case are indistinguishable from the facts of *Bronson*, "[w]e cannot say that it was inequitable . . . to add interest upon the amount of the tender." Id., 301.