******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

PACK 2000, INC. *v.* EUGENE C. CUSHMAN
(AC 41350)
(AC 41351)

DiPentima, C. J., and Keller and Bright, Js.

*Syllabus*

The plaintiff sought, in two separate actions, specific performance of two options to purchase certain real property that it had been leasing from the defendant. The parties executed two lease agreements, each of which contained an option to purchase the leased property. In declining to sell the property when the plaintiff exercised the options in 2003, the defendant claimed that the plaintiff had not complied with the conditions of the agreements and the plaintiff thereafter brought the present actions. The trial court rendered judgments for the plaintiff, concluding, inter alia, that the plaintiff was entitled to specific performance of the options because it had substantially complied with the conditions of the parties' agreements. On the defendant's appeal, this court reversed the trial court's judgments, concluding that the trial court improperly applied a substantial compliance rather than a strict compliance standard in determining whether the plaintiff had satisfied the conditions of the parties' agreements and that the trial court incorrectly concluded that the plaintiff had retained the right to exercise the options. On the granting of certification, the plaintiff appealed to the Supreme Court, which reversed this court's decision and remanded the case with direction to affirm the judgments of the trial court. The trial court thereafter rendered judgments and final orders thereon, setting the purchase price of each property based on the average of the present day value appraisals required by the court and submitted by the parties. On appeal to this court, the plaintiff claimed that the trial court erred in failing to determine the purchase prices based on appraisal values of the properties in 2003, and the defendant claimed in his cross appeal that the trial court abused its discretion in failing to use the current value appraisal set by his appraiser. *Held*:

1. The trial court erred in ordering a specific performance remedy that was contrary to the terms of the purchase options; having concluded that the plaintiff was entitled to a remedy of specific performance, the trial court, in accordance with the unambiguous language of the agreements, was required to order that the purchase price of each property was to be based on the appraised value of the property as of November 22, 2003, which was three months after the plaintiff exercised its options, the trial court, in basing the purchase prices of the properties on their values as of January, 2017, which was an improper application of the automatic appellate stay, deprived the plaintiff to its detriment of the Supreme Court's judgment, which affirmed the trial court's 2008 final judgments, by modifying its 2008 award of specific performance and ordering a remedy inconsistent with the parties' agreements, and the trial court's present day valuation deprived the plaintiff of the benefit of its bargain while giving a significant windfall to the defendant.

2. The trial court erred in ordering the plaintiff to make rent and use and occupancy payments and by refusing to credit any such payments against the purchase prices the plaintiff was required to pay for the properties, as the plaintiff's lessee obligations terminated when it exercised its options on August 22, 2003, and thereafter became the equitable owner; although the defendant claimed that equitable conversion was inapplicable because the plaintiff failed to plead the doctrine in its complaint, equitable conversion was not a separate cause of action but, rather, a result that arose out of a successful claim for specific performance, and, although the plaintiff continued to pay rent after it exercised its options, such payments, which were required under the lease, did not constitute a judicial admission on behalf of the plaintiff that it was obligated to make such payments, and the parties were not required to complete the appraisal process and to establish purchase prices for the properties in order for equitable title to pass to the plaintiff, nor was the plaintiff required to tender payment when it exercised its options

because payment was not a condition precedent in the purchase options, and the defendant's unexcused repudiation of the contracts was what prevented the completion of the appraisal process and the transfer of the properties to the plaintiff, and contrary to the defendant's argument, Connecticut case law does not require a showing of bad faith for the doctrine of equitable conversion to apply; moreover, the trial court erred in concluding that the plaintiff was not entitled to credit any rent or use and occupancy payments made after the plaintiff exercised its options and became the equitable owner of the properties as a reward of damages against the purchase price of the properties, the plaintiff was ordered to make certain such payments and did so to preserve its property rights, the defendant received more than the purchase price of the properties, and he had no legal or equitable entitlement to such funds; furthermore, the defendant could not prevail on his claim that he should receive interest on the purchase price of the properties based on their 2003 appraised values, as the defendant raised this issue for the first time on appeal and this court was not obligated to consider it.

3. The trial court did not err in failing to set the purchase price for one of the properties based on the appraised value submitted by the defendant, as there was no basis for concluding that the court made an erroneous factual finding based on documents regarding the appraisal conducted by the defendant and the plaintiff's purported acceptance of that appraisal, as such evidence was never admitted in the trial court; contrary to the defendant's claim, the record demonstrated that the plaintiff's agent believed that the appraisal submitted by the defendant would be averaged with the appraisal submitted by the plaintiff and that the evidence on which the defendant relied was only submitted as an attachment in support of a memorandum, and, in deciding a case, this court cannot resort to documents or exhibits which were not part of the record.

Argued October 23, 2019—officially released June 30, 2020

*Procedural History*

Action, in two cases, for specific performance of options to purchase certain of the defendant's certain real property, and for other relief, brought to the Superior Court in the judicial district of New London, where the matters were consolidated and tried to the court, *Abrams, J.*; judgments for the plaintiff, from which the defendant appealed to this court, *Lavine, Beach* and *Lavery, Js.*, which reversed the trial court's judgments and remanded the cases to the trial court with direction to render judgments for the defendant, and the plaintiff, on the granting of certification, appealed to the Supreme Court, which reversed this court's decision and remanded the cases to the trial court with direction to affirm the judgments of the trial court; thereafter, the trial court, *Abrams, J.*, rendered judgments setting the purchase prices of the properties, from which the plaintiff filed separate appeals, and the defendant filed cross appeals; subsequently, this court granted the plaintiff's motion to consolidate the appeals. *Reversed*; *judgments directed*.

*Eric W. Callahan*, for the appellant-cross appellee in AC 41350 and AC 41351 (plaintiff).

*Ralph J. Monaco*, with whom, on the brief, was *Eric J. Garofano*, for the appellee-cross appellant in AC 41350 and AC 41351 (defendant).

*Opinion*

BRIGHT, J. In these consolidated appeals, the plaintiff, Pack 2000, Inc., appeals from the judgments of the trial court, which determined the amount due the defendant, Eugene C. Cushman, for two properties he had contracted to sell to the plaintiff.[1] The plaintiff claims that the trial court erred in concluding that (1) the purchase prices for the properties, located in Groton and New London, should be based on their current appraised values, rather than their appraised values in 2003, (2) the plaintiff was required to pay use and occupancy for its continued use of the Groton property retroactive to June 1, 2014, until the closing of the sale of the property to the plaintiff, and (3) the plaintiff was not entitled to credits toward the purchase price of each property for moneys paid as rent or use and occupancy after it exercised its options to purchase the properties. The defendant filed cross appeals, claiming that the trial court abused its discretion by failing to use the current appraised value set by his appraiser as the purchase price for the Groton property. We agree with the plaintiff on all of its claims and disagree with the defendant as to his cross appeals. Accordingly, we reverse the judgments of the trial court and remand the cases with direction to determine the purchase prices of the properties pursuant to the plaintiff's exercise of its options to purchase the properties in 2003, that the court credit against those purchase prices any payments made by the plaintiff to the defendant for use of the properties after its exercise of its purchase options, and, to the extent that the payments to the defendant on each property, after the option became effective, exceeded the purchase price of that property, that the court order any overpayment be refunded to the plaintiff.

This case returns to us after our Supreme Court's decision in *Pack 2000, Inc.* v. *Cushman*, 311 Conn. 662, 89 A.3d 869 (2014), in which the court reversed the decision of this court; see *Pack 2000, Inc.* v. *Cushman*, 126 Conn. App. 339, 11 A.3d 181 (2011); and remanded the case to us with direction to affirm the judgments of the trial court.[2] Following our affirmance of the trial court's judgments, additional proceedings occurred in the trial court. We will address those proceedings and the judgments that followed, which are the subject of the present appeal, after setting forth the relevant facts.

The opinion of our Supreme Court sets forth the following relevant facts and procedural history, as supplemented by the record. "In July, 2002, the plaintiff, the defendant and ARCO Corporation (ARCO),[3] a corporation controlled by the defendant, entered into a business transaction in which two Midas . . . muffler shops[4] (shops) were to be transferred from ARCO to the plaintiff. As part of the transaction, the parties executed a number of agreements, including [1] two lease

agreements, under which the defendant leased [to the plaintiff] the [real property on which] the shops are located . . . [2] a management agreement, under which the plaintiff assumed responsibility for the management and operation of the shops . . . [3] a letter of intent . . . and [4] two promissory notes . . . .

"Each lease agreement contains a clause . . . that provide[d] the plaintiff with an option to purchase the leased [property] subject to certain terms and conditions. The language of the two clauses is essentially identical. Each clause provides in relevant part: So long as [the plaintiff] has been in compliance with the terms and conditions of this [l]ease, the [l]etter of [i]ntent, and [m]anagement [a]greement . . . and is in compliance with such instruments when the option is exercised, [the plaintiff] shall have the option to purchase the real estate subject to this lease. . . .

"Under the terms of the two lease agreements, the management agreement and the promissory notes, the plaintiff was required to make a number of periodic payments both to the defendant and to certain third parties in order to exercise the options.[5] Specifically, the plaintiff was required to pay rent to the defendant . . . to make payments on both promissory notes . . . until the notes were fully paid and to pay all accounts, including, but not limited to, utilities, telephone service, real estate taxes, and hazard and liability insurance as well as an equipment lease. . . .[6]

"On August 22, 2003, the plaintiff's vice president, M. Paulina Anderson, faxed a letter to the defendant in which she stated that she wanted to finalize the purchase of the shops and exercise the option[s] to purchase the real estate by the end of 2003." (Footnotes added and omitted; internal quotation marks omitted.) *Pack 2000*, *Inc.* v. *Cushman*, supra, 311 Conn. 660–68. Anderson further stated: "I have talked to our bank and they can finance the deal for us. The option in the leases indicates we need to agree on an appraiser, to come up with a price on the real estate. I want to use Arnold (Grant) whom I have used before. Please let me know if you agree to us using him, so I can order the appraisals." "On August 29, 2003, Anderson sent a second letter to the defendant in which she . . . indicated that Banterra Bank (bank) could not commit to financing the purchase until it had ascertained the value of the defendant's realty. [Anderson added: I have not heard from you on the appraisals. In order to get a price so we can close this year, I went ahead and (ordered) them. As I indicated on my fax to you last Friday, I worked with Arnold (Grant) before . . . . Please let me know your thoughts on this. If you elect to proceed with your own appraisals please do so ASAP so we can still close this year.]

"On September 2, 2003, the defendant, on behalf of ARCO, sent a letter to Anderson in which he stated that

the plaintiff was not in compliance with the terms and conditions of the management agreement. Specifically, the letter stated: The installment payment regarding the . . . [m]anagement [a]greement which was due September 1, 2003 has not been received. . . . Timely payment of the note was and is a material condition of the agreement. . . . You are hereby put on notice that this late payment, and all of the prior late payments, and any future late payments [put] you out of compliance with the terms and conditions of the Management Agreement. Subsequent acceptance of the September, 2003 payment (or any future payment tendered after the date due) will not cure the non-compliance, nor does ARCO . . . waive any rights or consequences which flow from your non-compliance. There is no record of the plaintiff having specifically responded to this letter. [It is apparent, however, that the parties treated this letter as the defendant's repudiation of the plaintiff's right to exercise the purchase options due to its late payments.] . . .

"On July 17, 2006, the plaintiff commenced these actions against the defendant claiming that it was entitled to specific performance of the options to purchase the defendant's realty. In its disclosure of defense, filed on August 4, 2006, the defendant argued that the plaintiff's claim was without merit because, among other things, the plaintiff had not complied with the terms of one of the promissory notes and the conditions of the lease at the time of its attempt to exercise the options, and, therefore, the options had been forfeited or terminated by the plaintiff's fault or noncompliance. . . .

\* \* \*

"On August 11, 2008, the trial court rendered judgments in favor of the plaintiff. The court determined that the plaintiff had retained the right to exercise the options because it had substantially complied with the terms and conditions of the [parties' agreements]. . . . The court also determined that the plaintiff had effectively exercised the options on August 22, 2003, and was entitled to specific performance. . . .

"The defendant appealed to the Appellate Court from the judgements of the trial court, claiming, inter alia, that the trial court was required to apply a strict rather than a substantial compliance standard in determining whether the plaintiff had satisfied the terms of the lease and management agreements and, in addition, that the trial court incorrectly concluded that the plaintiff had retained the right to exercise the options notwithstanding its late payments to the defendant. . . . The Appellate Court agreed with the defendant. . . . In accordance with these conclusions, the Appellate Court reversed the judgments of the trial court and remanded the case to that court with direction to render judgments for the defendant." (Citations omitted; footnotes added and omitted; internal quotation marks omitted.) *Pack*

*2000, Inc.* v. *Cushman*, supra, 311 Conn. 668–73. Our Supreme Court subsequently reversed this court's decision and remanded the case back to this court with direction to affirm the judgments of the trial court.[7] Id., 694.

On July 14, 2014, after we affirmed the judgments of the trial court, the plaintiff filed a motion for postjudgment orders. In its motion, the plaintiff requested that the trial court issue (1) an order setting the purchase prices of the Groton and New London properties to reflect the 2003 appraisal values rendered by Grant,[8] (2) an order confirming that, since August, 2003, the plaintiff—by way of monthly rent payments—has paid the entire purchase price for the Groton and New London properties, and, therefore, the defendant immediately must transfer the properties to the plaintiff free and clear of all liens and encumbrances, and (3) an order requiring the defendant immediately to reimburse the plaintiff the sum of the overpayments of the purchase price applicable to the properties. On November 17, 2014, the defendant filed a motion and memorandum in opposition to the plaintiff's motion. In its July 6, 2015 order addressing the plaintiff's motion, the court stated, "[i]n view of the fact that the parties could not proceed with the appraisal process until the recent termination of the appellate stay, they are ordered to [do] so immediately. The values of the property shall be present day and the court will not entertain any attempts to revisit its ruling by entertaining further evidence. None of the payments made by the plaintiff since its exercise of the option count toward the purchase price."[9]

On July 13, 2016, the plaintiff filed a motion for compliance, requesting that the court set a deadline for the exchange of appraisals. The defendant objected to the plaintiff's motion on July 22, 2016, arguing that the plaintiff had never issued a demand for the exchange of appraisals.[10] On December 6, 2016, the court ordered the parties to exchange appraisals on or before January 15, 2017. Grant appraised the Groton and New London properties, as of July 6, 2016, at $700,000 and $610,000, respectively. The defendant's appraiser, Robert Silverstein, appraised the Groton property as of January 4, 2017, at $1,100,000 and the New London property as of September 21, 2016, at $720,000. On April 7, 2017, following the mutual exchange of appraisals, the plaintiff filed a motion for final judgments. On January 22, 2018, the trial court rendered judgment in each case, holding: "Based on the submitted appraisals, pursuant to prior court orders and [§] 2 (b) of the applicable leases, the sale price for the Groton property is $900,000 and the New London property is $650,000." On February 9, 2018, the plaintiff filed the present appeals challenging the trial court's judgments, as well as its July 6, 2015, and May 27, 2016 orders. The defendant's cross appeals followed. Additional facts will be set forth as necessary.

The plaintiff first claims that the court erred when, as part of its award of specific performance, it determined the purchase prices of the Groton and New London properties based on the average of both parties' present day appraisals instead of determining the purchase prices based on 2003 appraisal values. The plaintiff claims that the court's judgment in each case is contrary to the parties' agreements. We agree.

We begin with the standard of review and legal principles relevant to our resolution of this claim. "[W]e note that the standard of review for a lease, which is a contract, is plenary. Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law." (Internal quotation marks omitted.) *Howard-Arnold, Inc.* v. *T.N.T. Realty, Inc.*, 315 Conn. 596, 602, 109 A.3d 473 (2015).

"It is a general rule that a contract is to be interpreted according to the intent expressed in its language and not by an intent the court may believe existed in the minds of the parties. . . . When the intention conveyed by the terms of an agreement is clear and unambiguous, there is no room for construction. . . . [A] court cannot import into [an] agreement a different provision nor can the construction of the agreement be changed to vary the express limitations of its terms."[11] (Citations omitted; internal quotation marks omitted.) *Levine* v. *Massey*, 232 Conn. 272, 278, 654 A.2d 737 (1995).

The following additional facts are relevant to our resolution of the plaintiff's first claim. In its August 11, 2008 memorandum of decision, the trial court determined that the plaintiff exercised its options to purchase the Groton and New London properties by way of a letter sent by fax to the defendant. The court stated: "In order for the exercise of an option to be effective, it must strictly comply with the contractual requirements regarding its exercise . . . . In this matter, the [m]anagement [a]greement and the [l]eases simply require the exercise of either option be in writing and occur within a given time period. The August 22, 2003 fax clearly fulfills both requirements."[12] The court also determined that the plaintiff was entitled to specific performance as a matter of equity. The court stated: "As set forth [previously], the court found that [the] plaintiff had the right to exercise the options at issue and that it did so effectively. To allow [the defendant] to enjoy the benefits of his bargain with [the] plaintiff while avoiding the less financially attractive elements of the transaction would be inequitable. As a result, the court finds that specific performance of the sale of the New London and Groton parcels pursuant to the terms

set forth in the agreements between the parties is the appropriate remedy in this matter." The court then ordered the parties immediately to "proceed with the appraisal process on both the New London parcel and the Groton parcel pursuant to the terms contained in § 2 (b) of each [l]ease."[13]

In accordance with Practice Book § 61-11 (a), the proceedings to enforce the trial court's decision were stayed automatically until the plaintiff filed its appeals on November 21, 2008, after which time the proceedings were stayed until the cases were remanded to the trial court after our Supreme Court's final determination of the consolidated appeal in *Pack 2000, Inc.* v. *Cushman*, supra, 311 Conn. 662.[14]

On December 19, 2014, following the termination of the appellate stay, the plaintiff moved to clarify the court's August, 2008 memorandum of decision. Specifically, the plaintiff sought clarification with respect to the date that the court intended the parties to use for appraisal purposes when valuing the Groton and New London properties. In its motion, the plaintiff maintained that requiring the parties to appraise the properties according to present day values would be wholly inconsistent with the court's determination that the plaintiff exercised its options in August, 2003. The defendant filed an objection to the plaintiff's motion on January 9, 2015, arguing that no purchase prices were established in 2003 because the parties never agreed on a mutually acceptable appraiser, and—pursuant to the terms of the lease agreements—each party would have needed to appoint its own appraiser for the court to establish a purchase price based on the average of the values rendered. On May 19, 2015, the court issued an order on the plaintiff's motion for clarification, stating: "The order does not permit the use of any prior appraisals nor does it limit itself to any particular time. In view of the fact that the parties could not proceed with the appraisal process until the recent termination of the appellate stay, they are ordered to [do] so immediately. The values of the property shall be present day and the court will not entertain any attempts to revisit its ruling by entertaining further evidence."[15]

In accordance with the court's order, the parties submitted to the court, and exchanged with each other, current appraisals of the properties as of July 6, 2016, September 21, 2016, and January 4, 2017. On the basis of the parties' appraisals, the trial court rendered judgment in each case and set the purchase price of the Groton property at $900,000 and the New London property at $650,000. The plaintiff claims on appeal that the court erroneously concluded that the automatic stay precluded the use of an appraisal date that preceded the Supreme Court's decision, in particular, August 22, 2003—the date that the plaintiff exercised its options. On the basis of the terms of the lease agreements and

the court's determination that the plaintiff exercised its options on August 22, 2003, we agree that the trial court erred by ordering the parties to use present day appraisal values for the properties. We conclude, however, that the correct appraisal date, pursuant to the terms of the lease and management agreements, is November 22, 2003, three months after the plaintiff exercised its options.

As a preliminary matter, neither party argues on appeal that the terms of the purchase options are ambiguous. Instead, the parties disagree as to whether the appellate stay affected the relevant appraisal date and by extension, the purchase prices of the properties. We conclude that the appellate stay is irrelevant to our resolution of this claim. Furthermore, we need look no further than to the unambiguous terms of the purchase options and the plaintiff's exercise thereof to conclude that the court erred in fashioning a specific performance remedy that was contrary to the unambiguous terms of the parties' contracts.

As previously stated in this opinion, our Supreme Court, in May, 2014, affirmed the trial court's determination that the plaintiff exercised its options to purchase the Groton and New London properties in August, 2003. After remand, in its July, 2015 order, the trial court reiterated its decree of specific performance but held that the "values of the property shall be present day." The court reached this conclusion because its August 11, 2008 order that the parties immediately proceed with the appraisal process for the properties did "not permit the use of any prior appraisals nor [did] it limit itself to any particular time," and because the appellate stay prevented the parties from conducting appraisals at an earlier date.

We first address the trial court's reliance on the automatic appellate stay. Practice Book § 61-11 provides that, during the time when an appeal can be taken and while a timely filed appeal is pending, "proceedings to enforce or carry out the judgment or order shall be automatically stayed until the . . . final determination of the cause." "The finality of a trial court judgment is not directly affected by the fact that an appeal automatically stays the enforcement of a judgment. See Practice Book § [61-11] (formerly § [4046]). The stay does not vacate the judgment obtained by the successful litigant. It merely denies that party the immediate fruits of his or her victory . . . in order to protect the full and unhampered exercise of the right of appellate review. . . .

"The finality of a judgment may, however, depend upon the outcome of the pending appeal. If the trial court's judgment is sustained, or the appeal dismissed, the final judgment ordinarily is that of the trial court. If, however, there is reversible error, the final judgment is that of the appellate court." (Citations omitted; inter-

nal quotation marks omitted.) *Preisner* v. *Aetna Casualty & Surety Co.*, 203 Conn. 407, 414–15, 525 A.2d 83 (1987). Because this court, after remand from the Supreme Court, affirmed the judgments of the trial court, the 2008 judgments of the court are the final judgments, and the plaintiff is entitled to the fruits of those judgments. The court, however, deprived the plaintiff of the benefits of those judgments. It essentially modified its 2008 award of specific performance, to the detriment of the plaintiff, by basing the purchase prices of the properties on the values of the properties as of January, 2017, approximately eight years after the final judgments. We conclude that this was an improper application of the automatic appellate stay.

We now turn to the court's rationale that its August 11, 2008 judgments did "not permit the use of any prior appraisals nor [did] it limit itself to any particular time." We view this statement as a reflection of the court's view that it had discretion to determine the appropriate appraisal date. We conclude that the court did not have discretion to fashion a remedy inconsistent with the parties' agreements.

The purchase option language of the lease agreements is clear: "The option shall be exercised by [the plaintiff] giving [the defendant] three months advance notice in writing." Once the option is exercised, "[t]he purchase price is to be determined by a mutually acceptable MAI appraiser. If the parties cannot agree on a single appraisal, then each party shall appoint [a] MAI appraiser. The price shall be set by the average of the appraisals. [The plaintiff] shall pay the cost of the mutually acceptable appraiser or [the plaintiff's] appraiser. Should [the defendant] deem it necessary to retain an appraiser, [the defendant] shall pay for such appraiser." In its August 11, 2008 memorandum of decision, the trial court found that Anderson's August 22, 2003 fax to the defendant, in which she stated that the plaintiff was exercising its purchase option on both properties and identified Arnold Grant as the plaintiff's chosen appraiser, constituted an effective exercise of the plaintiff's purchase options under the lease agreements. That finding was affirmed on appeal. The court also expressly rejected the defendant's claim that the options expired by their own terms three months after they were exercised, because "it was [the defendant's] refusal to accept the option[s] that caused the period to lapse." Put another way, but for the defendant's repudiation of the contracts, the plaintiff would have been afforded an opportunity to purchase the properties at their late 2003 appraised values. Consequently, the court held that "specific performance of the sale of the New London and Groton [properties] *pursuant to the terms set forth in the agreements between the parties* is the appropriate remedy in this matter." (Emphasis added.)

"Specific performance is an equitable remedy permitting courts *to compel the performance of contracts* for the sale of real property, and certain other contracts, pursuant to the principles of equity." (Emphasis added; internal quotation marks omitted.) *Landmark Investment Group, LLC* v. *Chung Family Realty Partnership, LLC*, supra, 125 Conn. App. 695. "[T]he primary purpose of a decree of specific performance, which is always an equitable remedy, is to place an injured purchaser of property in a position that replicates, as nearly as possible, that which it would have enjoyed but for the vendor's unexcused breach." *State* v. *Lex Associates*, 248 Conn. 612, 631, 730 A.2d 38 (1999).

"As a general rule, equity, in deciding whether to grant specific performance in enforcing a contract, will consider the fairness of an agreement in accordance with the circumstances as they existed at the time of the execution of the contract even though the property contracted to be sold becomes considerably more valuable at the time performance is due." *Robert Lawrence Associates, Inc.* v. *Del Vecchio*, 178 Conn. 1, 19, 420 A.2d 1142 (1979); see *Texaco, Inc.* v. *Golart*, 206 Conn. 454, 462–63, 538 A.2d 1017 (1988); *Battalino* v. *Van Patten*, 100 Conn. App. 155, 158 n.3, 917 A.2d 595, cert. denied, 282 Conn. 924, 925 A.2d 1102 (2007).

Thus, the court's decree of specific performance should have compelled the defendant's performance of the purchase options under the agreements and should have put the plaintiff in the position it would have been but for the defendant's breach. The court, therefore, should have turned to the language of the parties' agreements and applied that language to the situation of the parties as it existed when the defendant repudiated the plaintiff's properly exercised options. According to the unambiguous terms of § 10 (d) of the management agreements, once the plaintiff exercised its options, which it did on August 22, 2003, the closings of the plaintiff's purchases of the properties were to take place within three months, or by November 22, 2003. Thus, under the parties' agreements, the plaintiff was entitled to purchase the properties at their appraised values no later than that date.[16] Any alternative outcome, including the one ordered by the court, is inconsistent with the unambiguous terms of the contracts at the time they were executed.

The court's present day valuation deprives the plaintiff of the benefit of its bargain while giving a significant windfall to the defendant—the breaching party. The defendant has cited no authority, nor are we aware of any, that suggests that a lessor can benefit from a property's increase in value after its unexcused breach of a lease option. In fact, after a review of the contracts in the context of their execution in 2002, we are convinced to the contrary. "Otherwise, any lessor who regretted the terms of an option contract could disre-

gard the exercise of the option and continue to collect rents until the end of the lease. In other words, *the defaulting lessor could reap an economic gain from its own misconduct.*" (Emphasis added.) *State* v. *Lex Associates*, supra, 248 Conn. 622.

Accordingly, we conclude that the court erred in fashioning a specific performance remedy that was contrary to the terms of the purchase options. Having concluded that the plaintiff was entitled to the remedy of specific performance of the agreements, the court, in accordance with the unambiguous language of those agreements, was required to order that the purchase prices of the properties be based on the appraised values of the properties as of November 22, 2003.[17]

## II

The plaintiff next claims that it became the equitable owner of the Groton and New London properties when it exercised its options. Consequently, the plaintiff maintains that the court erred when it ordered the plaintiff to make rent and use and occupancy payments and when it concluded that such payments made by the plaintiff to the defendant after it exercised its purchase options should not be credited against the purchase prices of the properties. We agree.

The following additional facts are relevant to our resolution of the plaintiff's second claim. On November 19, 2014, the defendant filed a motion requesting that the court order the plaintiff to make use and occupancy payments for its continued use of the Groton property.[18] In his motion, the defendant argued that because the plaintiff had made use and occupancy payments from the time its lease term expired in July, 2012[19] until June 1, 2014, its continued business operations on the premises entitled the defendant to those payments as a matter of equity.[20] On January 22, 2015, the plaintiff filed an objection to the defendant's motion, arguing that it became the equitable owner of the properties in August, 2003, thereby excusing it from any obligation to make rental payments to the defendant. In its May 27, 2016 order ruling on the defendant's motion, the court stated: "While the plaintiff may be correct that it no longer has an obligation to make rental payments . . . it does not necessarily follow that it is not obligated to make use and occupancy payments. It has enjoyed possession of the property since it attempted to exercise the option in 2003 and to allow it to do so for free would be inequitable." The court concluded that the plaintiff was liable to the defendant for use and occupancy payments of $5000 per month retroactive to June 1, 2014 through the present. The plaintiff has complied with the court's order and has made use and occupancy payments through the present day. Furthermore, in its order of July 6, 2015, the court held that "[n]one of the payments made by the plaintiff since its exercise of the option count toward the purchase price."

We begin by setting forth the applicable standard of review. Although we review a court's decision on whether to issue a decree of specific performance under the abuse of discretion standard; see *Hill* v. *Raffone*, 103 Conn. App. 737, 742, 930 A.2d 788 (2007); we afford plenary review to the present claim because the structure and terms of the court's equitable remedy were based on an interpretation of law. See *Horner* v. *Bagnell*, 324 Conn. 695, 708, 154 A.3d 975 (2017) (applying plenary review to question of whether plaintiff was entitled, as matter of law, to award of unjust enrichment). Moreover, whether an equitable remedy is available in any particular case is a question of law subject to plenary review. *Ed Lally & Associates, Inc.* v. *DSBNC, LLC*, 145 Conn. App. 718, 735, 78 A.3d 148, cert. denied, 310 Conn. 958, 82 A.3d 626 (2013). Therefore, the question of whether the court was precluded from ordering use and occupancy payments and not crediting any such payments against the purchase prices of the properties because the plaintiff was the equitable owner of the properties after it exercised its options to purchase them is a legal one subject to plenary review.

The law pertaining to option contracts and equitable conversion is well established. "[E]quitable conversion is a settled principle under which a contract for the sale of land vests equitable title in the [buyer]. . . . Under the doctrine of equitable conversion . . . the purchaser of land under an executory contract is regarded as the owner, subject to the vendor's lien for the unpaid purchase price, and the vendor holds the legal title in trust for the purchaser. . . . The vendor's interest thereafter in equity is in the unpaid purchase price, and is treated as personalty . . . while the purchaser's interest is in the land and is treated as realty. . . . The doctrine is a legal fiction, *rooted in the principle that equity views a transaction as being completed at the time the parties enter into the transaction*, irrespective of whether a formal exchange of legal title has taken place." (Citations omitted; emphasis added; internal quotation marks omitted.) *Salce* v. *Wolczek*, 314 Conn. 675, 687–88, 104 A.3d 694 (2014).

"[A]n option to purchase . . . operates as a continuing offer to sell, irrevocable until the expiration of the time period fixed by the agreement of the parties, which creates in the option holder the power to form a binding contract by accepting the offer. . . . When a tenant exercises an option to purchase the leased premises, a new bilateral contract is created." (Citation omitted; internal question marks omitted.) *Howard-Arnold, Inc.* v. *T.N.T. Realty, Inc.*, supra, 315 Conn. 602–603.

"If such a lessor refuses proper tender of payment, a likely result . . . is that the former lessee and present equitable owner will remain in possession of the property pending the rendering of a judgment of specific performance. . . . [A] person who validly exercises an

option and properly tenders the option price has duly performed all of the conditions to be performed on its part, and as of that date became the equitable owner of the property. [In such a circumstance] an equitable owner of the real property [has] no further obligations to make rental payments." (Internal quotation marks omitted.) *Bayer* v. *Showmotion, Inc.*, 292 Conn. 381, 401, 973 A.2d 1229 (2009).

Once a lessee becomes the equitable owner of the property, "[i]ts ownership rights superseded and replaced its former leasehold obligations. That result follows from the logic of the situation. A lessor cannot retain a continued right to lease payments when those payments were made subsequent to the lessor's unexcused refusal to accept a proper tender of payment in full.[21] Otherwise, any lessor who regretted the terms of an option contract could disregard the exercise of the option and continue to collect rents until the end of the lease. In other words, the defaulting lessor could reap an economic gain from its own misconduct." (Footnote added.) *State* v. *Lex Associates*, supra, 248 Conn. 621–22.

The plaintiff contends that it was not obligated to make use and occupancy payments on the Groton and New London properties because it became the equitable owner of the properties after it exercised its options in August, 2003. The defendant first maintains that equitable conversion is inapplicable in this case for three procedural reasons, none of which is persuasive given the record and the relevant case law. Specifically, the defendant argues that equitable conversion is inapplicable because the plaintiff (1) failed to plead the doctrine in its complaint, (2) admitted it had an obligation to pay rent, and (3) did not appeal from the court's August, 2008 order of specific performance.

The defendant's first argument is misplaced because equitable conversion is not a separate cause of action but, rather, a result that arises out of a successful claim for specific performance. See *Southport Congregational Church–United Church of Christ* v. *Hadley*, 320 Conn. 103, 112, 128 A.3d 478 (2016) ("The basis of [equitable conversion] is the existence of a duty. . . . [T]here must, in fact, be a clear duty on the part of the seller to convey the property, a duty enforceable by an action for specific performance. . . . The doctrine is firmly linked to the specific enforceability of the contract." (Internal quotation marks omitted.)). Therefore, the defendant's argument that equitable conversion does not apply to the present case because the plaintiff neglected to plead it fails.

The defendant's second argument also lacks merit. The plaintiff's acknowledgment that it continued to pay rent after it exercised its options, as required under the terms of the lease, does not constitute a judicial admission on behalf of the plaintiff that it was obligated

to make rental and use and occupancy payments. Judicial admissions are voluntary and knowing concessions of fact, not law. See *Borrelli* v. *Zoning Board of Appeals*, 106 Conn. App. 266, 271, 941 A.2d 966 (2008). The plaintiff's statements that it continued to make payments to the defendant is a judicial admission of the fact of those payments. The plaintiff's characterization of those payments as rent or use and occupancy, however, is a legal conclusion that is not binding on this court.

The defendant's third argument ignores this case's extensive procedural history. The court ordered specific performance after determining that the plaintiff exercised its options and the defendant thwarted performance by repudiating the contract. It was not until the court's final judgments, dated January 22, 2018, that the plaintiff was able to file the present appeals. The defendant's argument lacks any sound basis in law and fact because (1) the plaintiff was precluded from appealing any of the court's orders of specific performance; see footnote 9 of this opinion; and (2) the court's final judgment orders relates back to its previous orders, including its orders of specific performance. Finally, any argument that the plaintiff needed to appeal the court's August, 2008 judgments to preserve its equitable conversion remedy is misguided because the plaintiff was not aggrieved by the court's 2008 judgments, which granted the plaintiff the remedy of specific performance. It did not state how the remedy would be implemented, and the plaintiff had no reason to expect that the court would subsequently issue orders that were inconsistent with the plaintiff's rights under the parties' contracts. The plaintiff became aggrieved only when the trial court, on remand, issued such orders, from which the plaintiff timely appealed. In addition, as noted previously in this opinion, equitable conversion is not a separate remedy that needs to be sought, but is, instead, the logical result of an award of specific performance of a contract for the sale of real property.

We turn now to the defendant's substantive arguments that (1) a proper balancing of the equities favors the trial court's determination that the plaintiff is required to make use and occupancy payments retroactive to June, 2014, (2) the failure of the parties to determine a purchase price for the properties precludes the application of equitable conversion, (3) Connecticut law requires that the plaintiff tender the purchase price before equitable conversion can apply, and (4) Connecticut law requires a showing of bad faith in order for equitable conversion to apply. We disagree with all of the defendant's arguments and address each in turn.

A

The defendant contends that principles of equity favor the trial court's determination that the plaintiff should be required to make use and occupancy pay-

ments, and the application of equitable conversion would achieve an unjust result. We are not persuaded.

The defendant's argument is based on the faulty premise that specific performance and equitable conversion are separate and distinct remedies; essentially, that it is possible to order specific performance of a contract for the sale of property and at the same time order that the purchaser under the contract is not yet the equitable owner of the property. This argument misses the fact that equitable conversion is not a separate remedy but, rather, is the legal effect of an enforceable contract to purchase property, and, by extension, an order that such a contract must be specifically performed. As our Supreme Court stated in *Lex Associates*, the conclusion that a lessee who exercises an option to purchase the leased property becomes the equitable owner of the property "follows from the logic of the situation." *State* v. *Lex Associates*, supra, 248 Conn. 621.

Consequently, once the court rendered judgments of specific performance, there were no equities to balance as to whether the plaintiff became the equitable owner of the properties. Its status as the equitable owner of the properties was just a legal and logical reality that resulted from the parties' agreements and the court's specific performance decree. See also *Southport Congregational Church–United Church of Christ* v. *Hadley*, supra, 320 Conn. 111 ("The foundation for the doctrine of equitable conversion is [the] presumed intention of the owner, equity regarding as done that which ought to be done. . . . The doctrine was adopted for the purpose of carrying into effect, *in spite of legal obstacles*, the supposed intent of a testator or settlor." (Citation omitted; emphasis added; internal quotation marks omitted.)).

Accordingly, we reject the defendant's contention that a balancing of the equities requires that the plaintiff make use and occupancy payments.

B

The defendant next argues that equitable conversion should not apply because the parties did not determine purchase prices for the properties. In his appellate brief, the defendant correctly states that equitable conversion does not apply when the seller's duty to convey title is subject to a condition precedent. By arguing that completing the appraisal process was a condition precedent to the application of equitable conversion in the present case, however, the defendant misinterprets the terms of the purchase options and ignores the trial court's determination that the plaintiff strictly complied with those terms.

"A condition precedent is a fact or event which the parties intend must exist or take place before there is a right to performance. . . . When the seller's duty to

convey title is conditional, and does not arise at execution, the buyer cannot immediately enforce the contract." (Citation omitted; internal quotation marks omitted.) Id., 113.

In its August, 2008 memorandum of decision, the court stated that a party to a contract must comply strictly with the terms of an option clause in order to exercise it. See *Bayer* v. *Showmotion, Inc.*, supra, 292 Conn. 409 ("[t]o be effective, an acceptance of an offer under an option contract must be unequivocal, unconditional, and in exact accord with the terms of the option"). The court also noted that the option clauses only required that the lessee, subject to its compliance with the terms and conditions of the leases (1) give notice of its exercise to the lessor in writing, and (2) give the lessor three months advance notice. The plaintiff strictly complied with both requirements, thereby exercising its options. In doing so, equitable title passed to the plaintiff because the contract did not condition exercise of the options on completion of the appraisal process. Put another way, the terms of the purchase options establish that the defendant's duty to convey title to the plaintiff arose at the moment the plaintiff gave written notice of its intent to exercise its options, not when the parties established purchase prices.

The defendant's argument to the contrary is essentially the same as its argument discussed previously in this opinion that the plaintiff's options expired by their own terms three months after they were exercised because the parties had not completed the appraisal process. The trial court rejected this argument because it was the defendant's unexcused repudiation of the contracts that prevented completion of the appraisal process and the transfer of the properties to the plaintiff. The same analysis applies to this variation of that argument. The defendant cannot use his unexcused breach of the parties' agreements to prevent the equitable conversion of the properties to the plaintiff. In fact, permitting him to do so would be decidedly inequitable.

Accordingly, we reject the defendant's contention that the parties needed to complete the appraisal process and to have established a purchase price for each property in order for equitable title to pass to the plaintiff.

C

The defendant further contends that Connecticut law requires an optionee to tender the purchase price before equitable conversion can apply to an option contract. In support of his argument, the defendant cites to several cases in which the purchase option at issue expressly defined the purchase price of the property. The purchase options in the present case, however, only defined the method by which the parties were to determine the purchase prices. The narrow issue here, which has not

yet been addressed by our courts, is whether the plaintiff was required to tender payment when it exercised its options, notwithstanding the fact that the parties had not yet established purchase prices.

In its May 27, 2016 order granting the defendant's motion for use and occupancy payments, the trial court distinguished the facts of *Lex Associates* from the present case, limiting the application of equitable conversion only to instances in which the optionee tenders the purchase price at the time it exercises its option. The court instead, analogized the present case to the circumstances in *Powertest Corp.* v. *Evans*, 665 F. Supp. 134 (D. Conn. 1986), concluding that equitable conversion does not apply when the optionee is able to enjoy the continued use of the property to the detriment of the lessor, who does not get the benefit of the use of the purchase price. For the reasons that follow, we disagree with the court's narrow application of *Lex Associates* as well as its reliance on *Powertest Corp.*

In *Powertest Corp.*, the plaintiff lessee attempted to exercise its option to purchase a parcel of property from the defendants pursuant to the terms of a fixed price purchase option in the lease. Id., 135. The defendants, after receiving a third party offer to purchase the property, refused to convey it to the plaintiff, arguing that the plaintiff had not validly exercised its option under the terms of the lease. Id., 136. Both parties filed cross motions for summary judgment seeking declaratory relief. Id., 135. In addition to its claim that it validly exercised its purchase option, the plaintiff also argued that it was entitled to credit toward the property's sale price for the rental payments it made after exercising its option. Id.

Clause fifteen of the lease, the subject of the parties' dispute, contained provisions that set forth two ways in which the plaintiff could purchase the property. Id., 136. The first paragraph of clause fifteen granted the plaintiff a fixed price option to purchase the property "at any time during the last [thirty] days of the initial ten year period of this lease and during the last [thirty] days of any extension thereof, *for the sum of $50,000*. Such option may be exercised by written notice from [the plaintiff] to [the defendants] to that effect. . . . [The plaintiff] *shall tender the purchase price to* [*the defendants*] and [the defendants] at the time of such tender shall deliver to [the plaintiff] a full covenant and warranty deed conveying said premises . . . thereon to [the plaintiff] . . . ." (Emphasis added.) Id.

The second paragraph of clause fifteen granted the plaintiff a right of first refusal. Id. The provision stated in relevant part: "Without prejudice to the foregoing option, [the plaintiff shall have the pre-emptive right during the term of this lease or any extension thereof to purchase said premises . . . owned by [the defendants] on the same terms and conditions as those of

any bona fide offer received by and acceptable to [the defendants] and [the defendants] before making any such sale or any agreement to sell, shall notify [the plaintiff] in writing of such terms and conditions. [The plaintiff] within sixty days after receipt of such notice, may exercise this pre-emptive right by written notice to [the defendants] to that effect." Id.

After notifying the plaintiff of a third party's offer to purchase the property for $400,000, the defendants argued that the fixed price option was extinguished and the plaintiff could only purchase the property on the same terms and conditions as the third party's offer. Id., 137. The court rejected the defendants' interpretation of the purchase option, noting that "the 'without prejudice' language used in the lease before this court appears to subordinate the right of first refusal to [the] plaintiff's rights under the [fixed price] option." Id., 138. The court relied on the principle that "purchase options in leases are normally inserted for the benefit of the lessee and should be interpreted in light of this purpose" and concluded that the defendants' interpretation of clause fifteen would nullify the plaintiff's benefit under the fixed price option, particularly in light of the unambiguous language of the lease. Id.

Having granted the plaintiff's motion for summary judgment as to the valid exercise of the fixed price option, the court was left with the plaintiff's claim that it was entitled to credit toward the purchase price for rental payments it made thereafter. Id., 141. The court rejected the plaintiff's claim, stating that "these rental payments are economically similar to interest payable on the unpaid principal of a mortgage. The plaintiff has not yet paid the amount of this principal and the defendants have not had the benefit of the use of the funds. Because the plaintiff has been able to enjoy the continued use of the property without having to part with the [$50,000] purchase price, there is no reason to allow [the] plaintiff to receive credit for the amounts paid in rent since its attempt to exercise its [fixed price] option." Id.

The trial court's reliance on *Powertest Corp.* to reach its conclusion in the present case ignores the critical differences in the lease terms at issue. Most notably, the purchase option in *Powertest Corp.* explicitly stated that the purchase price of the property was $50,000. Conversely, the purchase options in the present case did not articulate purchase prices for the Groton and New London properties but, instead, provided only that the prices would be determined through an appraisal process. Like the plaintiff in *Powertest Corp.*, the plaintiff in the present case validly exercised its options by way of written notice to the defendant. The important distinction, however, is that the plaintiff in the present case was never afforded an opportunity to tender the purchase prices because of the defendant's refusal to

participate in the appraisal process. In fact, it was his own improper repudiation of the contract that deprived the defendant of the benefit of the use of the purchase price funds, not the plaintiff's inaction. Were we to apply the court's analysis in *Powertest Corp.* to the present case, we would effectively reward the defendant for his breach. Furthermore, the court in *Powertest Corp.* did not discuss the doctrine of equitable conversion. Instead, it reached its conclusion by equating the plaintiff's rental payments to interest payments on a mortgage and the option payment to the principal of the mortgage. Regardless of whether such an approach was appropriate given the specific facts of *Powertest Corp.*, our Supreme Court made clear in *Lex Associates* that a much different analytical framework applies to a lessor's repudiation of the lessee's exercise of its purchase option. We apply that framework in this case.

In *Lex Associates*, the plaintiff exercised its option to buy property that it had been leasing from the defendant and tendered the purchase price at the closing in accordance with the terms of the purchase option. *State* v. *Lex Associates*, supra, 248 Conn. 616. The defendant rejected the plaintiff's tender, and the plaintiff promptly filed an action for specific performance. Id. During the pendency of the case, the plaintiff continued to make rental payments to the defendant, eventually exceeding the purchase price of the property.[22] Id. The plaintiff argued that the excess payments were a setoff against the purchase price, while the defendant claimed that the payments simply were rent owed to it due to the plaintiff's continued use of the property pendente lite. The trial court granted the plaintiff's motion for summary judgment and allocated the pendente lite payments to the plaintiff as a setoff to the purchase price. Id. The court, however, awarded damages to the defendant in the form of interest on the purchase price. Id. On appeal, our Supreme Court affirmed the judgments of the trial court as to the plaintiff's setoff but reversed as to the defendant's award of interest. Id., 617.

In *Lex Associates*, our Supreme Court determined that, after exercising its option and becoming the equitable owner of the property, the plaintiff's "ownership rights superseded and replaced its former leasehold obligations." Id., 621. The court further stated: "Under the circumstances of the present case, therefore, we agree with the [plaintiff] that the trial court properly credited the postclosing payments against the purchase price. The [plaintiff] kept its tender open. . . . The [plaintiff's] pendente lite payments to [the defendant] throughout the course of this protracted litigation do not diminish the rights that accrued to the [plaintiff] on October 15, 1990, the date of the tender of payment. Having demonstrated its right to specific performance of [the defendant's] promise to convey title, the [plaintiff] had a right to be placed, as nearly as practicable, in the same position as if [the defendant] had performed

its contract obligations in timely fashion. . . . But for [the defendant's] unexcused refusal to convey title on October 15, 1990, [the defendant] would have had no possible claim to further payments from the [plaintiff]. [The defendant's] own breach of contract cannot entitle it to keep such payments now. . . .

"In sum, because [the defendant's] unexcused refusal to accept the [plaintiff's] tender of full payment on October 15, 1990 was a material breach of a valid lease contract, [the defendant] *cannot recover as rents any payments to which it would not have been entitled had it honored its contract obligations properly and promptly*." (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 625.

As previously stated in this opinion, in the present case, both the trial court and our Supreme Court determined that the plaintiff fully complied with the terms of the lease options, despite never having completed the appraisal process. The defendant's argument that the plaintiff should have tendered payment for the properties when it exercised its options is misguided for two reasons. First, the defendant's argument asks us to insert a condition precedent in the purchase options that does not exist. In *Lex Associates*, the tender of the purchase price was required in order to exercise the purchase option. Such tender was not required in this case. Again, the option terms only required the plaintiff to give the defendant three months advance notice, in writing, of its exercise of its options. Once the plaintiff fully complied with those terms, a contract was formed and equitable title passed from the defendant to the plaintiff. See *Salce* v. *Wolczek*, supra, 314 Conn. 688. There were no conditions in the lease regarding the amount that the plaintiff was required to tender or the manner in which the plaintiff was required to tender payment. To the contrary, the options contemplated future payment after completion of the appraisal process, which necessarily requires us to conclude that the plaintiff was under no obligation to tender undetermined purchase prices at the time it exercised its options.

Second, the defendant ignores the fact that he precluded the plaintiff from tendering payment by repudiating the contract and refusing to proceed with the appraisal process. After years of delay and protracted litigation, the defendant now argues that the plaintiff cannot invoke its right to equitable title because the plaintiff failed to tender the purchase prices that the defendant prevented it from determining. Were this court to accept the defendant's argument, any lessor of property could frustrate a lease's purchase option by refusing to perform an obligation necessary to enable the lessee to tender the purchase price. Put another way, a lessor could foreclose a lessee from exercising its option to purchase the property in favor of continued

rent payments through the expiration of the lease. Such a conclusion is inconsistent with general principles of equity and contract law.[23]

Accordingly, given the specific facts of this case, we reject the defendant's contention that equitable title to the properties did not pass to the plaintiff because the plaintiff did not tender payment when it exercised its options.

D

The defendant also argues that Connecticut law requires a showing of bad faith on the part of the breaching lessor in order for equitable title to vest in the purchaser. In support of this contention, the defendant cites to *Heyman* v. *CBS, Inc.*, 178 Conn. 215, 217, 423 A.2d 887 (1979), and *State* v. *Lex Associates*, supra, 248 Conn. 616, neither of which supports his argument. In *Heyman*, the defendant exercised its option to purchase the subject property and the plaintiffs refused to convey, arguing that the option clause was unenforceable because of the statute of frauds. See *Heyman* v. *CBS, Inc.*, supra, 178 Conn. 217. Our Supreme Court rejected the plaintiffs' argument, concluding that the defendant exercised its option and became the equitable owner of the property when it tendered payment in accordance with the conditions of the option clause. Id., 220.

In *Lex Associates*, the defendant refused to convey the property at closing and argued on appeal that the purchase option was unenforceable because it was not supported by adequate consideration due to an alleged lack of mutuality of obligation. See *State* v. *Lex Associates*, supra, 248 Conn. 617. Our Supreme Court rejected the defendant's argument, concluding that the plaintiff was relieved of its rental obligations when it exercised its option and tendered payment in accordance with the lease terms. Id., 624–25.

The defendant maintains that both *Heyman* and *Lex Associates* stand for the proposition that equitable conversion is applicable only when a lessor or vendor breaches in bad faith. We are not persuaded. Like the defendant in the present case, the vendors in *Heyman* and *Lex Associates* did not refuse to convey the properties in bad faith. In fact, our Supreme Court makes no mention of bad faith in either case.

The defendant in the present case repudiated the contract on the basis of his mistaken belief that the plaintiff had not validly exercised its options. Our Supreme Court determined that the defendant's good faith refusal to convey the properties, like the vendors in *Heyman* and *Lex Associates*, was ultimately an unexcused breach of the lease options. The nature of the breach did not affect our Supreme Court's analysis in either *Heyman* or *Lex Associates*, nor does it affect ours in the present case.

Accordingly, we reject the defendant's contention that Connecticut law requires a showing of bad faith for equitable conversion to apply.

We, therefore, conclude that the plaintiff's lessee obligations terminated when it exercised its options and became the equitable owner of the properties. Consequently, the trial court erred by ordering that the plaintiff make rent and use and occupancy payments and by refusing to credit any such payments against the purchase prices the plaintiff was required to pay for the properties.

### III

The plaintiff's final claim is that the logical conclusion that flows from its right to credits against the purchase prices of the properties for any payments it made after it exercised its options is that it is entitled to a refund from the defendant to the extent that those payments exceeded the purchase prices of the properties. Conversely, the defendant argues that the plaintiff's mistake of law in paying rent and use and occupancy does not entitle it to an award of damages. Additionally, the defendant contends, for the first time on appeal, that the plaintiff owes interest on the purchase prices. The plaintiff argues that the defendant's claim for interest is improper because he never requested interest from the trial court and because the equities do not support such an award. We agree with the plaintiff on both damages and interest.

### A

Because the trial court concluded that the plaintiff was not entitled to credit any rent or use and occupancy payments against the purchase prices of the properties, it never addressed the question of whether the plaintiff was entitled to an award of damages if such payments were greater than the total of the purchase prices. Nevertheless, we resolve the issue because it is purely a question of law that flows from our conclusion that the plaintiff became the equitable owner of the properties upon the exercise of its purchase options on August 22, 2003.

Our Supreme Court's analysis in *Lex Associates* informs our conclusion that the plaintiff is entitled to an award of damages for payments it made to the defendant in excess of the purchase prices of the properties. As previously stated in part II C of this opinion, the plaintiff did not tender full payment of the purchase prices because it was foreclosed from doing so as a result of the defendant's repudiation of the contract. When it was forced to litigate its right to exercise its options, the plaintiff, as did the plaintiff in *Lex Associates*, continued making payments on both properties to avoid any claim that it had forfeited its rights to the properties. Although it eventually ceased making payments on the New London property when it vacated

the premises in 2012, it has continued to make payments on the Groton property, including from June 1, 2014, to the present pursuant to the trial court's order. We see no logical basis to limit the credit to which the plaintiff is entitled to the amount of the purchase prices of the properties. The plaintiff was required to pay the defendant no more than the purchase prices determined pursuant to the parties' agreements, and the defendant was entitled to receive no more than those amounts. To the extent that the defendant has received, in total, more than the purchase prices of the properties, he has no legal or equitable entitlement to such funds and must return them.

The defendant attempts to avoid this conclusion by arguing that he is not responsible for the plaintiff's mistake of law in voluntarily continuing to make rent and use and occupancy payments to the defendant after the plaintiff exercised its options. We find this argument unavailing for two reasons. First, not all of the payments made by the plaintiff for which it seeks credit were made voluntarily. In reliance on our Supreme Court's decision in this case, the plaintiff stopped making monthly payments on the Groton property as of June 1, 2014. See footnote 8 of this opinion. Thereafter, in response to the defendant's motion for continued use and occupancy payments, the trial court ordered that the plaintiff make monthly use and occupancy payments on that property, retroactive to June 1, 2014. Thus, payments since June 1, 2014, were in no way voluntary. For the defendant to suggest that such court ordered payments were the result of the plaintiff's own mistake of law is without merit.

Second, the defendant's argument would mean that the plaintiff's entitlement to damages turns entirely on the label assigned to its payments, thus elevating form over substance. As stated previously in this opinion, the plaintiff's characterization of its continued payments to the defendant as rent or use and occupancy is a legal conclusion—not a judicial admission—which is not binding on this court. Our analysis is guided by the fact that the plaintiff, despite being the equitable owner of the properties, continued to make payments to the defendant until May, 2014, in an effort to preserve its property rights. Once our Supreme Court determined that the plaintiff did, in fact, validly exercise its purchase options, it ceased making payments in accordance with its ownership rights. The fact that the defendant had no right to continued payments after the plaintiff exercised its options in August, 2003, turns on the legal conclusion that the plaintiff, at that point, became the equitable owner of the properties.[24] The same is true of the plaintiff's right to a return of any overpayments it made.

Accordingly, we agree with the plaintiff that, to the extent that the payments it has made since exercising

its options exceeded the determined purchase prices of the properties, the plaintiff is entitled to an award of damages equaling the amount of the overpayment.

## B

The defendant also claims that if we determine that the purchase prices of the properties should be determined based on their November, 2003 appraised values, he is entitled to interest on the purchase prices. We reject the defendant's claim for two reasons. First, the defendant is raising this issue for the first time on appeal and, therefore, we are under no obligation to consider it. See *Guddo* v. *Guddo*, 185 Conn. App. 283, 286–87, 196 A.3d 1246 (2018). Second, our Supreme Court considered and rejected a virtually identical claim in *Lex Associates*.

In *Lex Associates*, our Supreme Court noted that a necessary predicate of an award of prejudgment interest is a determination that the party against whom interest is to be awarded has wrongfully detained money owed to the aggrieved party. *State* v. *Lex Associates*, supra, 248 Conn. 628. Notwithstanding the trial court's determination that the plaintiff's tender of the full purchase price demonstrated that it did not wrongfully detain money owed to the defendant, the court still ordered that the plaintiff pay prejudgment interest. Id. In reversing the trial court, our Supreme Court stated: "In the absence of any wrongdoing by the [plaintiff], the best that can be said for [the defendant] is that it entertained a good faith but mistaken belief that the option contained in the lease was unenforceable. [The defendant's] *mistake does not provide an equitable basis for an award of interest to it as compensation for its own delay in conveying title* to the [plaintiff]. . . .

"It is true that, even though the [plaintiff] did not wrongfully withhold the purchase price from [the defendant], a tender of payment is not the equivalent of payment itself. Refusal of a tender of payment, however, while it does not discharge a debt, discharges any further accrual of interest if the purchase keeps the tender good pendente lite." (Emphasis added.) Id., 629.

Although the plaintiff in the present case did not tender payment when it exercised its options, the options did not require that it do so. Furthermore, the defendant's mistaken belief that the options were unenforceable is what caused the delay in conveying title to the plaintiff. The same logic that our Supreme Court applied in *Lex Associates* applies here. The plaintiff made every effort to close on the properties pursuant to the terms of the options and the defendant wrongfully prevented that from coming to fruition.[25]

Accordingly, we reject the defendant's contention that he should receive interest on the purchase price of the properties.

## IV

Finally, we turn to the defendant's cross appeal. On appeal, the defendant claims that the parties agreed to an appraiser, Robert Silverstein, for the valuation of the Groton property and, in accordance with the terms of the purchase option for that property, Silverstein's valuation should determine its purchase price. The defendant argues that the court erred by averaging the appraisals of Silverstein and the plaintiff's appraiser, Grant. For the reasons that follow, we reject the defendant's claim.

Before addressing the merits of the defendant's claim, we set forth the applicable standard of review, which the defendant asserts is plenary because his cross appeal involves an issue of contract interpretation. The defendant is mistaken, however, as the issue he raises is one concerning the trial court's conclusion as a matter of fact that the parties did not agree to a mutually acceptable appraiser. Although the defendant contends that the trial court erred by failing to use only Silverstein's appraisal, as purportedly required by the purchase option, the defendant is actually challenging the court's implicit factual finding that the parties never reached an agreement to use only Silverstein's appraisal.[26] Therefore, our standard of review is clearly erroneous. See *Valley National Bank* v. *Marcano*, 174 Conn. App. 206, 217, 166 A.3d 80 (2017).

The following additional facts and procedural history are relevant to our resolution of the defendant's claim. On June 24, 2008, at trial, the defendant cross-examined the plaintiff's vice president, Anderson, on her negotiations with the defendant, the appraisal process, and Silverstein's appraisals of the Groton and Westerly, Rhode Island properties.[27] When asked on cross-examination if the plaintiff agreed that it would purchase the Groton and Westerly properties in accordance with the Silverstein appraisal, Anderson replied "no." Anderson further testified that "[t]he reason we did . . . Silverstein's appraisal was after our offer—I realized that I couldn't force [the defendant] to take an appraisal, and I offered to pay—for him to select a MAI appraiser, and I was going to pay for the appraiser, and so—I did so. So, I paid for . . . Silverstein's appraisal, and I was expecting to average [it with Grant's appraisal] and proceed with the purchase of the Groton real estate." She also testified that "[t]he price was not to be set by . . . Silverstein. The price was going to be set by both appraisals."

On July 2, 2008, at trial, the defendant also testified as to the parties' contract negotiations and the appraisal process. He testified that, in either late 2005 or early 2006, he and Anderson agreed that he would sell the Groton property to the plaintiff based on Silverstein's appraisal. He testified though, that any such sale was to be made outside the option process. In particular, when asked about his obligations under the purchase

options on cross-examination, the defendant testified that "I made it clear to . . . Anderson . . . every single time I talked to them after 2003 that if we talked about selling any of these properties it would not be under the option. The option was done, it was complete; it was kaput. I made that perfectly clear, and we proceeded with the Westerly purchase on that basis, and it wasn't done under the options . . . it even says it in there that it is not done under the options." The defendant offered no other evidence at trial that the plaintiff agreed that Silverstein was to be the sole appraiser on the plaintiff's exercise of its option to purchase the Groton property.

After the case was remanded to the trial court, following our Supreme Court's May 20, 2014 decision, the defendant, on May 18, 2015, filed a postappeal trial memorandum regarding his position in light of the remand. In that memorandum, the defendant stated, as fact, that "[a]s part of the negotiating for the sale of the Westerly real property, on January 25, 2005, Anderson, at the suggestion of Cushman, proposed in writing that . . . Silverstein also be the mutually acceptable appraiser for the Groton and New London real properties. In that written proposal Anderson also stated that she would close on Groton within [two] months after receiving the Silverstein appraisal for Groton. (Proposed [e]xhibits 31 through 31G, series of [e-mails] between Paulina Anderson and Cushman (ARCO Corp.), dated 25 to 26 January 2005, respectively)." The defendant, referring to additional "proposed exhibits," also represented that Anderson had engaged Silverstein to appraise the Groton property, and that Silverstein had appraised the property as having a value, as of February 23, 2005, of $625,000. Despite his reference to proposed exhibits, the defendant did not attach any such exhibits to his postappeal trial memorandum. Nor did he move to open the evidence in the case to introduce these documents. However, in his memorandum of law dated December 21, 2017, filed in anticipation of the trial court's hearing after remand, the defendant, for the first time, attached copies of alleged e-mails between Anderson and Cushman, in which Anderson purportedly proposed that Silverstein act as the parties' mutually acceptable appraiser for the Groton property.

In his appellate brief before this court, the defendant argues that the trial court failed to consider Anderson's trial testimony and her e-mails with him when it calculated the purchase price of the Groton property based on an average of the parties' appraisals, instead of relying solely on the Silverstein appraisal. The defendant maintains that this evidence establishes that the parties mutually had agreed on an appraiser in accordance with the Groton lease terms and, therefore, the court abused its discretion by failing to set the purchase price in accordance with Silverstein's appraisal. We disagree.

First, the defendant has mischaracterized Anderson's testimony. She testified that she thought Silverstein's appraisal would be averaged with Grant's appraisal. Thus, it was not clearly erroneous for the court to rely on an average of the parties' appraisals when it determined the purchase price for the Groton property.

Second, the e-mails on which the defendant relies were never admitted as evidence before the trial court. "This court is limited in its review to matters contained within the record. In deciding a case, this court cannot resort to matters extraneous to the formal record, to facts which have not been found and which are not admitted in the pleadings, *or to documents or exhibits which are not part of the record.*" (Emphasis added.) *Blakeman* v. *Planning & Zoning Commission*, 82 Conn. App. 632, 641 n.8, 846 A.2d 950, cert. denied, 270 Conn. 905, 853 A.2d 521 (2004).

During oral argument before this court, the defendant conceded that the documentary evidence regarding the Silverstein appraisal and the plaintiff's purported acceptance of it was not entered into evidence, as it was only submitted as an attachment to its December 21, 2017 memorandum.[28] There is simply no basis for concluding that the court made an erroneous factual finding based on documents that were never submitted into evidence. Accordingly, we conclude that the court did not err in failing to set the purchase price for the Groton property at Silverstein's appraised value.

The judgments are reversed and the cases are remanded with direction to determine the purchase prices of the properties as of November 22, 2003, pursuant to the plaintiff's exercise of its options to purchase the properties in 2003 and the appraisals submitted by the parties regarding the values of the properties as of November 22, 2003, to credit against those purchase prices any payments made by the plaintiff to the defendant for use of the properties after it exercised its purchase options, and to order the defendant to refund to the plaintiff the amount of its payments made that exceeded the purchase prices of the properties.

In this opinion the other judges concurred.

[1] The plaintiff commenced the underlying actions by way of two separate complaints; see *Pack 2000, Inc.* v. *Cushman*, Superior Court, judicial district of New London, Docket No. CV-06-5001396-S (July 17, 2006), and *Pack 2000, Inc.* v. *Cushman*, Superior Court, judicial district of New London, Docket No. CV-06-5001397-S (July 17, 2006); seeking specific performance of separate lease with option agreements to purchase the Groton and New London properties, respectively. The trial court consolidated both matters for trial on June 24 and July 2, 2008.

[2] Our Supreme Court determined that (1) a substantial compliance standard—rather than a strict compliance standard—applies when an option to purchase property is conditioned on a lessee's compliance with a lease, (2) the plaintiff substantially complied with the lease requirements, and (3) the plaintiff was ready, willing, and able to purchase the properties when it exercised its options. *Pack 2000* v. *Cushman*, supra, 311 Conn. 662, 680–90.

[3] ARCO was not named as a defendant in the present actions and, consequently, is not a party to this consolidated appeal.

[4] One of the shops is located in the city of New London and the other is

located in the town of Groton.

[5] Specifically, both leases were for two terms of five years each, with the first term beginning in July, 2002 with an annual rent of $48,000 payable in monthly installments of $4000. The second term required an annual rent of $60,000 to be paid in monthly installments of $5000.

[6] This payment structure is also known as triple net rent.

[7] See footnote 2 of this opinion.

[8] According to Grant's 2003 appraisals, the purchase price for the Groton and New London properties were $415,000 and $385,000, respectively.

[9] On November 30, 2015, the plaintiff attempted to appeal from the court's order in each case. This court dismissed the plaintiff's appeals on January 27, 2016, for lack of a final judgment.

[10] In its objection, the defendant also asserted that the parties mutually agreed to use Robert Silverstein as the appraiser for the Groton and New London properties, an argument that the defendant first presented to the trial court on May 15, 2015, in his postappeal trial memorandum. The plaintiff has, at all times, disputed the defendant's contention, citing its July 14, 2014 motion for postjudgment orders as evidence that it intended to use Grant as its appraiser.

[11] We note that specific performance is an equitable remedy to be issued at the discretion of the trial court, and the trial court's decision whether to award specific performance is reviewed for an abuse of that discretion. *Landmark Investment Group, LLC* v. *Chung Family Realty Partnership, LLC*, 125 Conn. App. 678, 695, 10 A.3d 61 (2010), cert. denied, 300 Conn. 914, 13 A.3d 1100 (2011). There is no challenge in this consolidated appeal to the trial court's decision to award the plaintiff specific performance. Consequently, the abuse of discretion standard of review is not implicated. Instead, the question is whether the court correctly interpreted the parties' agreements when it crafted its specific performance award. Thus, our standard of review is plenary.

[12] Section 10 (d) of the management agreement provides in relevant part: "The purchase prices shall be determined by a mutual[ly] acceptable MAI appraiser. If the parties cannot agree on a single appraisal, then each party shall appoint an MAI appraiser. The price shall be set by the average of the appraisals. . . . [The plaintiff] shall give [the defendant] written notice of its intention to exercise the option three (3) months in advance so that the appraisals may be performed."

[13] Section 2 (b) of the Groton lease, which is virtually identical to the New London lease, provides: "The purchase price is to be determined by a mutually acceptable MAI appraiser. If the parties cannot agree on a single appraisal, then each party shall appoint an MAI appraiser. The price shall be set by the average of the appraisals. [The plaintiff] shall pay the cost of the mutually acceptable appraiser or [the plaintiff's] appraiser. Should [the defendant] deem it necessary to retain an appraiser, [the defendant] shall pay for such appraiser."

[14] Practice Book § 61-11 (a) provides in relevant part: "Except where otherwise provided by statute or other law, proceedings to enforce or carry out the judgment or order shall be automatically stayed until the time to file an appeal has expired. If an appeal is filed, such proceedings shall be stayed until the final determination of the cause. . . ."

[15] The court's May 19, 2015 order in response to the plaintiff's motion for clarification was consistent with, and virtually identical to, its July 6, 2015 order requiring the parties to immediately proceed with the appraisal process based on present day values.

[16] See footnote 12 of this opinion.

[17] On remand, the court is not required to use only appraisals that exist as of this date. It may rely also on appraisals subsequently prepared, so long as the appraisals value the properties as of November 22, 2003. To the extent that there is a variance in the MAI appraisals submitted by the parties, the court is required, pursuant to the terms of the leases, to set the purchase prices of the properties by averaging the appraisals.

[18] The defendant did not move for use and occupancy payments with respect to the New London property because the plaintiff vacated the premises at the end of its lease term in July, 2012. The plaintiff states on appeal that it fully reserves the right to acquire legal title to the New London property pursuant to its option in the lease and management agreement.

[19] See footnote 4 of this opinion.

[20] Our Supreme Court's May 20, 2014 decision in *Pack 2000, Inc.* v. *Cushman*, supra, 311 Conn. 662, prompted the plaintiff to cease making use and occupancy payments to the defendant.

[21] Although the plaintiff did not tender payment to the defendant for the properties, it was prevented from doing so by the defendant's unexcused breach of failing to participate in the appraisal process called for in the leases. Consequently, given the facts of this case, we reject the defendant's contention that, under *Bayer* and *Lex Associates*, the plaintiff did not become the equitable owner of the properties when it exercised its options. See part II C of this opinion.

[22] The purchase price stipulated in the amended lease was $395,000, and the payments made by the plaintiff totaled $398,142. *State* v. *Lex Associates*, supra, 248 Conn. 616.

[23] General principles of contract law establish that an optionee has no duty to tender all or part of the purchase price at the time it exercises its option when the contract terms are silent as to the price or the time and method of tender. See *Matrix Properties Corp.* v. *TAG Investments*, 609 N.W.2d 737, 742–43 (N.D. 2000) ("[w]here the exercise of the option to purchase does not provide for payment of the purchase price coincident with the optionee's exercise of the option, the payment of the purchase price is merely an incident of performance of the bilateral contract created by the exercise of the option"); see also *Parkway Trailer Sales, Inc.* v. *Wooldridge Bros., Inc.*, 148 Conn. 21, 25, 166 A.2d 710 (1960) ("The lease itself was silent as to the manner in which the option was to be exercised. It did not provide that the plaintiff had to pay the purchase price on or before the expiration of the lease. Rather it conferred a privilege upon the plaintiff which did not become binding upon any party until the plaintiff notified the defendants that it was taking up the option. This it did when its attorney sent the letter of April 17, 1957, to Wooldridge. Thereupon a binding bilateral contract came into being; it obligated the defendants to convey title by good and sufficient deed and obligated the plaintiff to accept the deed and pay the purchase price."); annot., 71 A.L.R.3d 1201, § 7 (1976) ("[i]n those cases in which the courts have been called upon to interpret option contracts which did not explicitly require the payment of the purchase price as a condition precedent to exercise of the option . . . the courts have generally been inclined to construe such agreements as calling simply for a promise by the optionee to pay the price, rather than for actual payment thereof, and as looking to formation, through the giving of such promise, of a bilateral contract of purchase and sale, with performance thereof by each of the parties to be completed within a reasonable time thereafter").

[24] In support of his argument that the plaintiff is not entitled to a damage award for moneys paid voluntarily under a mistake of law, the defendant cites to *Rockwell* v. *New Departure Mfg. Co.*, 102 Conn. 255, 128 A. 302 (1925). In *Rockwell*, the trial court held that the defendant employer was entitled to recover commissions paid to the plaintiff under a mistake of law. Id., 279. Our Supreme Court reversed, holding that "when the parties to a written contract stand on an equal footing as to means of knowledge of their contract obligations, money paid by one to the other, in part performance of the contract, in response to a claim made in good faith and based upon a permissible but erroneous construction of the contract, cannot be recovered back as money paid under a mistake of law." Id., 308–309. The defendant's reliance on *Rockwell* is misplaced.

In the present case, the plaintiff's continued rental payments to the defendant did not arise out of the plaintiff's mistaken interpretation of the parties' agreements. Nor were they made in part performance of the contract. Rather, the plaintiff's continued payments were the product of the defendant's repudiation of the contract. The plaintiff's payments were no more a mistake of law than were the plaintiff's continued payments in *Lex Associates*.

[25] We note also that the defendant's claim that he has been deprived of the use of the purchase prices of the properties is somewhat overstated given that the plaintiff has been paying the defendant monthly since it exercised its options and may very well have paid the defendant more than that to which he is entitled for the properties. To the extent that this is the case, the defendant has enjoyed the use of moneys he had no right to receive.

[26] Although the court did not explicitly find that there was no agreement to use Silverstein, its valuation of the Groton property, based on an average of the parties' appraisals, necessarily means that it rejected the defendant's claim that the parties had agreed to use Silverstein exclusively.

[27] An additional parcel of property located in Westerly, Rhode Island, was involved in the parties' contract negotiations but is not at issue in this appeal.

[28] During oral argument before this court, counsel for the defendant described the filing to which the proposed exhibits were attached as a postappeal motion for further findings. We have been unable to locate any

such filing on the trial court's docket. Furthermore, the only filing we could locate to which the proposed exhibits were attached was the defendant's December 21, 2017 memorandum. During argument at the December 21, 2017 hearing before the trial court, counsel for the defendant did make reference to the proposed exhibits by stating that the defendant could "make a record" that the communications constituted "business records between the plaintiff and the defendant." However, there is nothing in the record to show that the defendant actually moved to open the evidence, or that the trial court denied such a motion. In any event, it is clear that the proposed exhibits were never admitted as full exhibits. It is equally clear that the defendant has not argued in his cross appeal that the trial court erred in failing to admit into evidence the proposed exhibits.

---